**UNITED STATES of America, Appellee,**

v.

**Darrell P. LOGAN, Appellant.**

**No. 94–1074.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1994.

Filed March 7, 1995.

Rehearing Denied April 5, 1995.

Elizabeth Unger Carlyle, Lee's Summit, MO, argued, for appellant.

Peter Martin Ossorio, Asst. U.S. Atty., Kansas City, MO, argued, for appellee.

Before MAGILL, BEAM, and LOKEN, Circuit Judges.

MAGILL, Circuit Judge.

Darrell P. Logan appeals his jury conviction of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Logan raises six issues on appeal: (1) a *Batson*[1] challenge; (2) the district court[2] erred by refusing to admit evidence of a conversation between coconspirators; (3) the court erred by refusing to give a duress or coercion jury instruction; (4) insufficiency of the evidence; (5) sentencing error in refusing to adjust Logan's sentence downward because he was a minor participant; and (6) ineffective assistance of trial counsel. We affirm.

## I. BACKGROUND

Logan challenges the sufficiency of the evidence; accordingly, we view the evidence in the light most favorable to the government, giving it the benefit of all favorable inferences. *United States v. Agofsky,* 20 F.3d 866, 869 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994). We will discuss only the facts necessary to decide the issues before us.

In January 1993, Logan became involved in an ongoing conspiracy transporting co-

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. The Honorable Joseph E. Stevens, Jr., Chief Judge, United States District Court for the Western District of Missouri.

caine from Los Angeles for distribution in Kansas City. The participants referred to their drug trafficking and distribution activities as "Snake Enterprise." Although Logan did not become involved in Snake Enterprise until January 1993, the Enterprise began in March 1992. Originally, Aaron Reed, the kingpin of the Enterprise, who lived in Los Angeles, arranged to transport cocaine to Kenneth Hulett to sell in Kansas City. At this time, Tawnya Anderson and Dameon Brown used various forms of public transportation to transport drugs and money to and from Los Angeles and Kansas City. However, this method of transportation soon proved problematic. In July 1992, $21,020 in drug proceeds was seized from Brown at the Kansas City International Airport. In August 1992, $38,000 in drug proceeds was seized from Anderson at the Amtrak station in Kansas City. Also in August, Anderson began maintaining records for the Enterprise and relocated to Kansas City to oversee the distribution activities in Kansas City.

Reed began to realize that public transportation was too dangerous and purchased several vehicles. When the vehicles were used, cocaine was placed in the spare tire and driven to Kansas City. Once the cocaine was sold, the drug proceeds were placed in the spare tire and driven to Los Angeles. In the beginning, Brown was the "lead driver." Various other individuals were also recruited to make the nonstop drives between Los Angeles and Kansas City.

Another problem arose: Reed and Brown both had to serve three months, from January 1993 to March 1993, in jail in California on an unrelated state drug charge. Accordingly, Reed needed to recruit more people to keep the Enterprise running. At this point, Anderson recruited Logan to work as a driver for Snake Enterprise, transporting cocaine from Los Angeles to Kansas City, then returning to Los Angeles with the drug proceeds. An associate of Reed's ran the California side of the operation and Anderson continued to run the Kansas City side.

At first, Logan accompanied other drivers to and from Los Angeles and Kansas City to learn the route that the Enterprise used. Eventually, Logan became the lead driver for Snake Enterprise, making at least five trips as the lead driver. Logan was paid between $1000 to $2000 per one-way trip depending upon the amount of cocaine or money involved. Occasionally, Kimberly Ramirez or Shelia Edwin would accompany Logan on these trips. Their purpose was simply to make the trips appear less suspicious, and they would receive $500 per trip. Logan eventually rented an apartment in Kansas City so that he would have a place to stay between trips.

In June 1993, undercover officers in Kansas City made controlled purchases of cocaine from Hulett. A search warrant was obtained for Hulett's residence and three kilograms of cocaine were found, some in the process of being "cooked" into "crack" cocaine. Hulett then began cooperating with the government, acting as an informant. As a result of his cooperation, Reed, Anderson, Brown, Ramirez and Logan were indicted for conspiracy to distribute more than five kilograms of cocaine. Reed,[3] Anderson, Brown and Ramirez all pled guilty to the charged offense.

Logan proceeded to a jury trial. At trial, he advanced three defense theories: the kingpin of Snake Enterprise, Reed, was a violent man who threatened Logan and others in the conspiracy; at the time Logan agreed to drive cars for Reed, he was unaware that he would be transporting drugs and money; and once he became aware of what was going on, he could not withdraw from the conspiracy. Hulett, Anderson, Brown and Ramirez all testified as government witnesses. Logan did not testify at trial. Logan proffered a jury instruction on the defense of coercion or duress. The district court refused this instruction, holding that it was not supported by the evidence. The jury convicted Logan and he was sentenced to 151 months in prison. Further

---

**3.** At the time of Logan's trial, Reed was a fugitive from justice, but was later apprehended and pled guilty.

details will be developed as we treat those specific issues.

## II. DISCUSSION

Logan appeals, raising six issues. First, the government's use of a preemptory challenge to strike a black juror violated *Batson*. Second, the district court erred by excluding a tape of threatening remarks made by Reed to Hulett. Third, the district court erred in refusing to give a jury instruction on coercion or duress. Fourth, the evidence at trial was insufficient to sustain a conviction for conspiracy. Fifth, the district court erred by refusing to allow a minor participant departure in calculating his sentence under the Sentencing Guidelines. And finally, he received ineffective assistance of counsel because his trial attorney failed to object to certain hearsay statements at trial. We address each issue in turn.

### A. *Batson*

Logan asserts the district court erred in finding that his equal protection rights under *Batson* were not violated when the government used a peremptory challenge to strike an African–American juror, Ella Potts, from the jury panel.

*Batson* held that use of peremptory challenges to strike potential jurors "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the [government's] case against a black defendant" violated the Equal Protection Clause of the Fourteenth Amendment. 476 U.S. at 89, 106 S.Ct. at 1719. If Logan makes a prima facie showing of racial discrimination under *Batson*, the burden shifts to the government to offer "a clear and reasonably specific explanation of his [or her] *legitimate reasons* for exercising the challenges." *Id.* (internal quotations and citations omitted) (emphasis in original). Logan may, but is not required to, show that the government's offered reason is pretextual. *United States v. Brooks*, 2 F.3d 838, 840 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1117, 127 L.Ed.2d 427 (1994). Finally, the district court must determine whether Logan has established purposeful discrimination by the government. *Id.*

The district court's determination that there was no purposeful discrimination is a factual finding; accordingly, we review for clear error. *United States v. Wilson*, 884 F.2d 1121, 1124 (8th Cir.1989) (en banc). We give the district court's findings great deference when they rest upon an evaluation of credibility. *Id.* A finding is clearly erroneous if, based upon our review of all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotations and citations omitted).

Initially, the government attempted to challenge Ms. Potts for cause because she answered a question about prior jury service when the court was inquiring about prior grand jury service, a delay of approximately fifteen minutes from when the court inquired about prior jury service. In response to the challenge for cause, the court conducted an in camera examination of Ms. Potts. Ms. Potts explained that her delay in answering was because, at that time, she was confused about the questions asked. The court denied the government's challenge for cause and the government exercised a peremptory strike against Ms. Potts.

The district court required the government to offer reasons for its use of a peremptory strike against Ms. Potts, without expressly finding that Logan had made a prima facie showing of purposeful discrimination. The government stated that it believed Ms. Potts was either "inattentive or confused or evasive," Voir Dire Tr. at 66, in her responses to voir dire questions and in camera questions, specifically noting that she offered an inaudible response when the court first asked about prior jury duty, answering the question approximately fifteen minutes later. The district court found that the government's reason for striking Ms. Potts was legitimate and it observed that Ms. Potts was neither attentive nor responsive to questions asked during voir dire and in chambers. *Id.*

Logan argues the district court erred because two other jurors provided delayed responses to voir dire questions and one other juror gave a confused response to a question. Logan does not, however, argue that any of

these three potential jurors were either inattentive or nonresponsive to questions asked of them. Accordingly, they are not similarly situated to Ms. Potts. The district court's finding that Ms. Potts was neither attentive nor responsive to questions during both voir dire and the in camera examination was a credibility determination that we do not believe is clearly erroneous. Thus, we agree with the district court's holding that the government did not violate *Batson.*

### B. Exclusion of Taped Conversation Between Coconspirators

■ Logan argues that the district court erred by excluding evidence of a taped telephone conversation between Hulett, Reed and Brown that occurred on July 5, 1993. The conversation occurred after Hulett became a government informant. Throughout the conversation, Reed makes threatening remarks to Hulett, replete with graphic and derogatory language. Logan argues that this evidence was relevant to show he did not voluntarily agree to participate in the conspiracy and to illustrate Reed's demeanor to the jury. We find the government in the unusual position of arguing that these statements made by Reed, a coconspirator, are inadmissible hearsay.

■ The district court has broad discretion to determine whether evidence is admissible. We will overturn its decision only if there was an abuse of discretion. *United States v. Kroh,* 915 F.2d 326, 331 (8th Cir. 1990) (en banc). Furthermore, "[t]he discretion accorded lower courts in determining admissibility of evidence 'is particularly broad in a conspiracy trial.'" *Id.* (citation omitted). We believe the district court acted within its discretion by excluding the taped conversation.

With respect to the issue of Logan's voluntary agreement to participate in the conspiracy, assuming that Reed's statements are not hearsay, Logan has not demonstrated the relevancy of these statements. *See* Fed. R.Evid. 401. The telephone conversation is between Reed, Hulett and Brown. Logan did not make an offer of proof that he was

aware that the conversation took place or of its threatening nature. Accordingly, we fail to see how these statements demonstrate that Logan believed Reed would retaliate against him if he attempted to withdraw from the conspiracy.

With respect to Reed's demeanor, the district court stated that the taped statements would open "a whole Pandora's box of collateral issues." IV Trial Tr. at 459. The district court also stated that it believed one taped statement was only minimally probative of Reed's demeanor. *Id.* at 457. Under Federal Rule of Evidence 403, a trial court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues" or the evidence is cumulative. As offered to show Reed's demeanor, we believe this evidence was properly excluded under Rule 403.

Reed's taped statements to Hulett were replete with derogatory and explicit language. As such, they were inflammatory and prejudicial. Additionally, the conversation did not mention Logan or his position in the conspiracy. The district court found that the statements opened a Pandora's box of collateral issues. In this respect, there was a possibility of confusion of the issues. Furthermore, this taped statement was cumulative. Hulett, Anderson and Brown testified that Reed was a violent person who retaliated against business associates that "crossed him." Anderson and Brown testified that they heard Reed threaten Logan, stating, "if Darrell was to cross him, he would put him six feet under." III Trial Tr. at 329. Thus, evidence of Reed's demeanor was before the jury and the taped conversation was merely cumulative. The district court did not abuse its discretion by determining that the possibility of unfair prejudice, confusion of the issues and the cumulative nature of the evidence substantially outweighed its minimal probative value.

### C. Jury Instructions

■ Logan argues that the district court erred by refusing to give his proffered jury instruction on coercion and duress.[4] The

---

4. In a supplemental pro se brief, Logan argues

the district court erred in failing to give other

government argues that coercion and duress are not defenses to a conspiracy that does not require an overt act and, in any event, the evidence presented at trial does not support giving an instruction.

▇▇▇▇ The district court is afforded wide discretion in formulating jury instructions. We will affirm the district court if "the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." *United States v. Brown*, 33 F.3d 1002, 1003–04 (8th Cir.1994) (citations omitted). Generally, a defendant is entitled to an instruction as to any recognized defense if there is sufficient evidence for a reasonable jury to find in his favor with respect to the defense. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988).

We need not address the government's argument that coercion and duress are not available as a defense because the conspiracy does not require an overt act and Logan cannot be coerced into entering a voluntary agreement. Assuming arguendo that such a defense is available, we agree with the district court's decision that there was not sufficient evidence introduced at trial to support such an instruction.

▇▇▇▇ A duress defense consists of the following elements:

> Coercion which will excuse the commission of a criminal act must be immediate and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. One who has full opportunity to avoid the act without danger of that kind cannot invoke the doctrine of coercion and is not entitled to an instruction submitting that question to the jury.

*United States v. May*, 727 F.2d 764, 765 (8th Cir.1984) (per curiam) (internal quotations and citations omitted). Before Logan is entitled to an instruction on this defense, there must be sufficient evidence introduced at trial on all elements of duress. *Id.*

Hulett, Anderson and Brown all testified that Reed was a violent person with a reputation for retaliating against people that owed him money. They also testified that Reed used intimidation to conduct his business. Hulett and Anderson each testified to specific brutal attacks that they either witnessed or heard about. These attacks were against people who owed Reed money. Anderson and Brown also testified that in May 1993, they were present when Reed threatened to "put [Logan] six feet under" if Logan crossed Reed. Anderson also testified that Reed kept a close watch on all of his employees. However, there was no testimony presented that Reed retaliated against people who attempted to leave the conspiracy; nor was there any testimony that Reed considered an attempt to leave the conspiracy as "crossing him." Accordingly, Logan has not established that he had a "well-grounded apprehension of death or serious bodily injury" if he did not continue to participate in the conspiracy, the essential element of a duress defense. Furthermore, no evidence was presented that he tried to leave the conspiracy or that participation in the conspiracy was inevitable. *See May*, 727 F.2d at 765 (duress instruction not warranted when no evidence presented that defendant tried to escape or crime was inevitable although evidence of threats of serious bodily harm was introduced).

The only evidence presented with respect to Logan's entry into the conspiracy was that Anderson recruited him in northern California, they flew together to Los Angeles to meet Reed, and while they were in Reed's apartment, cocaine was being packaged on the kitchen counter. This evidence is plainly inconsistent with Logan's claims that he was unaware he would be transporting cocaine when he agreed to drive for Reed.

Thus, we believe the evidence was plainly insufficient to support a jury instruction on the defense of duress and the district court properly refused to give one. We also note that Logan could, and did, argue that the government did not meet its burden of prov-

---

instructions concerning the coconspirators' testimony. We need not address this argument, as we note that the instructions Logan argues

should be given were in fact given in Jury Instruction No. 6.

ing that he entered into a voluntary agreement.

### D. Sufficiency of the Evidence

 Logan argues that insufficient evidence exists to support his conviction. When reviewing a jury's verdict to determine if it is supported by sufficient evidence, we consider the evidence in the light most favorable to the verdict, accepting as established all reasonable inferences tending to support the verdict. *Agofsky,* 20 F.3d at 869. We will reverse only if "no reasonable jury could have found [Logan] guilty beyond a reasonable doubt." *United States v. Frayer,* 9 F.3d 1367, 1371 (8th Cir.1993) (citation omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994).

 Logan does not argue that a conspiracy to distribute cocaine does not exist. Rather, he argues that the evidence failed to connect him to the conspiracy. It is well established that after the existence of a conspiracy is established, only slight evidence linking Logan to the conspiracy is required to support his conviction. *Agofsky,* 20 F.3d at 870.

 The government introduced ample evidence linking Logan to the conspiracy. We need not recite all the evidence against him. Anderson testified that when she initially introduced Logan to Reed, Reed was packaging drugs in his house. III Trial Tr. at 325. Brown testified that he was present at this initial meeting and cocaine was in plain view on the kitchen counter. *Id.* at 391–92. Anderson testified that she paid Logan between $500 and $1500 per trip, depending upon how many kilograms of cocaine he brought in his vehicle's spare tire. Anderson testified that when she was absent from Kansas City, Logan transported cocaine to Kansas City from Los Angeles and was responsible for transporting the money back to Los Angeles. II Trial Tr. at 238. Anderson testified that Logan drove for Reed a "couple of times a month." Documentary evidence was introduced that Logan received $2000 for one of his trips from Los Angeles to Kansas City. Brown testified that on one trip he and Logan made to Kansas City, Logan supervised the removal of the cocaine from the spare tire of the vehicle while Brown was outside making a phone call. III Trial Tr. at 361. Ramirez testified that she helped place drug money in the spare tire of a vehicle while Logan was present. *Id.* at 431. It is the jury's duty, not ours, to review the credibility of these witnesses and to weigh their testimony. *United States v. Zerba,* 21 F.3d 250, 252 (8th Cir.1994). We are convinced that the evidence provides a sufficient basis for the jury's verdict that Logan participated in the charged conspiracy.

### E. Minor Participant

 Logan also argues that the district court erred in refusing to award him a two level reduction in offense level because he was a "minor participant" under U.S.S.G. § 3B1.2(b). The guidelines define a minor participant as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n. 3). Downward adjustment is available "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment. (backg'd). Whether Logan's role in the conspiracy was minor for purposes of a § 3B1.2(b) reduction is a factual determination. We review the district court's factual determinations for clear error.

 The record supports the district court's determination that Logan was not a minor participant. Under the guidelines, "[t]he mere fact that the defendant was less culpable than his co-defendant[s] does not entitle the defendant to 'minor participant' status as a matter of law." *United States v. Rayner,* 2 F.3d 286, 288 (8th Cir.1993) (quoting *United States v. West,* 942 F.2d 528, 531 (8th Cir.1991)). Participants in a conspiracy to distribute drugs often have distinct roles. Those differences are not always relevant in determining sentences. *United States v. Ellis,* 890 F.2d 1040, 1041 (8th Cir.1989). The determination whether a defendant is a minor participant turns on his culpability, not his status as a courier. *Id.* "[A] defendant

may be a courier without being substantially less culpable than the average defendant." *Id.* at 1041–42 (internal quotations and citation omitted).

The court found that Logan "had a complete understanding of the magnitude of the overall criminal activity." IV Trial Tr. at 519. It also found that Logan became so involved in transporting cocaine to Kansas City for the Enterprise that he rented an apartment in Kansas City to stay at between trips. The court also found that during the period of time that Reed and Brown were in jail and Anderson was in Richmond, California, Logan was responsible for transporting cocaine to Kansas City, for delivering the cocaine to distributors in Kansas City, and returning the proceeds to California. *Id.* at 519–20. Accordingly, we hold that the court did not commit clear error in refusing to adjust Logan's sentence downward two levels as a "minor participant."

### F. Ineffective Assistance [5]

 Logan argues that he received ineffective assistance of counsel at trial because his attorney failed to object to certain hearsay statements at trial. The government objects to our consideration of this issue because it was not raised at the trial level; it argues that Logan should raise this issue in a postconviction proceeding under 28 U.S.C. § 2255.

Ineffective assistance of trial counsel was not raised below in any posttrial motions. "This court will not consider an ineffective assistance claim on direct appeal if the claim has not been presented to the district court so that a proper factual record can be made." *United States v. Kenyon*, 7 F.3d 783, 785 (8th Cir.1993) (citations omitted). Logan argues that we can determine the ineffective assistance issue from the face of the transcripts. Accordingly, he argues no additional factual

findings need be made and the district court need not address the issue.

A similar argument was made in *United States v. Holy Bear*, 624 F.2d 853, 856 (8th Cir.1980). We declined to consider the ineffectiveness claim, stating "(1) it would be inappropriate for us to examine the merits of the claim if the trial court has not done so and (2) our failure to address the incompetency of counsel issue will not prejudice the appellant." *Id.* Although ineffective assistance was not raised in the district court in *United States v. Ford*, we addressed the issue because all the relevant facts were known and the government did not object to our determination of the issue. 918 F.2d 1343, 1350 (8th Cir.1990). We believe this case is distinguishable from *Ford* because the government has objected here. If either the district court had addressed this issue or the government did not object to our hearing this issue, we would address it. However, since neither of these conditions are satisfied, we decline to consider this issue on direct appeal.[6] Logan may still address this issue in a postconviction proceeding under § 2255.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court.

We wish to extend our thanks to Logan's appointed appellate counsel for her thorough and excellent presentation of issues in both her brief and at oral argument.

---

5. Logan raises several other issues in a pro se supplemental brief. He raises ineffective assistance of both trial and appellate counsel. We decline to consider his arguments for the same reasons enunciated herein. Additionally, he argues that he was deprived of his right to self-representation on direct appeal. We reject this argument because he was allowed to file a pro se brief raising any additional points he wanted us to consider.

6. If the government had not objected to our consideration of this issue, we would have addressed it. Based upon our review of the trial transcripts, we would be inclined to find no ineffective assistance of trial counsel.