# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 98-1365

————————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Lee Vernell Jackson, | * | |
| | * | |
| Appellant. | * | |

————————

Submitted: June 10, 1998

Filed: August 13, 1998

————————

Before BOWMAN, Chief Judge, BEAM, Circuit Judge, and GAITAN,[1] District Judge.

————————

FERNANDO J. GAITAN, JR., District Judge.

Lee Jackson appeals his four-count conviction for orchestrating a fraudulent check writing scheme. He claims the Government failed to prove that the object of the conspiracy charged in Count I was to constitute the commission of a crime cognizable under federal law; the Government failed to prove that five or more of the documents charged in Count III were in or affecting interstate commerce; Count II charges the

———————————

[1]The HONORABLE FERNANDO J. GAITAN, JR., United States District Judge for the Western District of Missouri, sitting by designation.

same crime as Count III; the amount of loss was based, in part, on speculation; the enhancement for obstruction of justice was not supported by reliable evidence, and the restitution order was imposed in violation of law. This court affirms in part and reverses in part the decision of the district court.[2]

## I.    BACKGROUND

On May 21, 1997, Jackson was indicted for conspiracy to possess or utter counterfeit securities (18 U.S.C. §§ 371 and 513), two counts of possessing five or more identification documents (18 U.S.C. § 1028(a)(3)) and one count of possessing fifteen or more unauthorized access devices (18 U.S.C. § 1029(a)(3)). Trial commenced on August 28, 1997. Jackson twice moved for a judgment of acquittal, which was both times denied.

At trial, evidence was presented regarding a check writing fraud scheme that Jackson was alleged to have organized and run with the help of female accomplices. The evidence suggested that Jackson's scheme to defraud had five basic components. First, he purchased the contents of stolen purses (checkbooks, credit cards, driver's licenses, social security cards). Tr. at 183-85. Second, he altered the stolen driver's licenses by replacing the photographs on the licenses with those of his accomplices. Tr. 192. Third, he provided his accomplices with the altered driver's licenses along with the matching credit cards and social security cards for identification purposes. Fourth, he provided his accomplices with counterfeit payroll checks and stolen personal checkbooks that matched the names on the driver's licenses. Fifth, he helped his accomplices cash the counterfeit payroll checks and negotiate the first three personal checks out of each stolen checkbook for his benefit. The remaining personal checks were for his accomplices' own uses. Counterfeit checks were drawn from payroll

---

[2]The HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota presided at Jackson's jury trial and sentencing.

accounts at various local business and organizations, including the City of Shoreview, Minnesota and the University of Minnesota. Tr. at 191-95, 242-44, 395-98, 422-45. The checks were negotiated by co-conspirators at local business, such as Target Stores. Id.

Various accomplices testified at trial. Tiffany Olson testified for the Government that Jackson took her photograph and made her five or six fake identification cards from other people's drivers licenses. She testified that she passed stolen checks for Jackson and split the cash with him. Tr. at 395-97. Kristine Hawkins testified that Jackson provided her with counterfeit payroll checks from Hennepin County, Brown & Bigelow, the University of Minnesota, and the City of Shoreview. Tr. at 192. When she received the checks she took them to Target stores and usually cashed them for just under $500, because Jackson told her that Target had a policy of cashing any check under that amount. Tr. at 193-94. Nancy Osborn and Karen Fox also testified that they negotiated counterfeit payroll checks at Target for Jackson. Tr. at 242-43, 424-35. Osborn said the checks usually ranged from $200 to $600. Osborn received approximately $100 - $150 from each of the checks she cashed. Tr. at 244. Fox stated that the counterfeit checks she passed were for amounts close to $500 and that she received $100 and $150 for each check. Tr. at 426.

The investigation revealed certain real evidence, including check stock paper similar to that used for the University of Minnesota counterfeit checks, Tr. at 287, 99-100, a laminating machine, plastic laminates the size of typical identification document, Tr. at 290, a glue stick and press board, Tr. 292, Polaroid photographs of different woman standing in front of a blue drop cloth, Tr. 302, 06, 08, and a typewriter. Tr. at 307.

After the close of the evidence, the jury returned guilty verdicts as to all four counts on September 5, 1997. The Probation Office issued a Presentence Investigation Report ("PSR"), concluding that the Guidelines prescribed a range of 77 to 96 months

imprisonment. This conclusion was reached using a calculated total offense level of 21 and a criminal history category of VI. After the presentence report was completed, Jackson filed his objections and the Government filed its responses. Thereafter, on January 28, 1998, the court held an evidentiary hearing and sentenced Jackson. The court imposed a 77 month sentence on Count IV, 36 month sentences on Counts II and III, as well as a 60 month sentence on Count I, all to run concurrently, a supervised release term of three years, a $400 special assessment, and a restitution order of $26,449.26.

## II. DISCUSSION

Jackson challenges his sentence, claiming that the Government failed to prove that the object of the conspiracy charged in Count I was to constitute the commission of a crime cognizable under federal law; the Government failed to prove that five or more of the documents charged in Count III were in or affecting interstate commerce; Count II charged the same crime as Count III; the amount of loss was based, in part, on speculation; the enhancement for obstruction of justice was not supported by reliable evidence; and the district court judge erred in entering the restitution order.

A. Did the Government fail to prove that the object of the conspiracy charged in Count I was to constitute the commission of a crime cognizable under federal law?

Jackson was convicted of Count I of the indictment, which alleged conspiracy to possess or utter counterfeit securities, 18 U.S.C. §§ 371 and 513. Title 18 U.S.C. § 371 prohibits a person from conspiring to commit "any offense against the United States." Section 513 prohibits the making, uttering, or possessing a counterfeit security of "a State," "a political subdivision thereof," or "an organization." It defines "security" broadly to include a "check" and "organization" to mean "a legal entity, other than a government, established or organized for any purpose ... which operates in or the activities of which affect interstate ... commerce." Jackson argues federal

jurisdiction does not exist over a conspiracy to counterfeit securities of a state or political subdivision thereof and that the offense lacks a connection to interstate commerce.

The standard of review on a claim of insufficient evidence is stringent. We review the evidence in the light most favorable to the jury's verdict. United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir.1996). We give the verdict the benefit of all reasonable inferences that might be drawn from the evidence. United States v. Gaines, 969 F.2d 692, 696 (8th Cir.1992); United States v. Logan, 49 F.3d 352, 359 (8th Cir.1995).

The issue is whether the defined term "organization" refers, in this case, to the banks where the accounts were held or to the account holders, which are state bodies. The Government argued, and the district court concluded, that for purposes of the § 513 definition, the organizations were the banks on which the accounts were drawn. Clearly the City of Shoreview and the University of Minnesota cannot be defined as "organizations" because the term specifically excludes government entities.

Jackson argues that neither can the banks be organizations. First, he argues that the bank on which the University of Minnesota checks were drawn, "Northwest," was a non-existent entity. However, this is only true due to appellant's own misspelling of the name "Norwest." Jackson was charged with counterfeiting the securities of "Norwest Bank," a real entity, not with counterfeiting the securities of the non-entity "Northwest Bank." Therefore, this argument is has no merit. Second, appellant argues that the banks cannot be the organizations referred to by § 513 because a check is the security of the person whose holds the account and not of the bank itself, Black's Law Dictionary 237 (6th ed. 1990). We agree with the reasoning of United States v. Chappell on this point. 6 F.3d 1095 (5th Cir. 1993). "[S]ection 513 does not expressly or impliedly state that a document may be the security of only one organization." Id. at 1099. While it is clear that the definition prevents the bank account holder, the City

-5-

of Shoreview and University of Minnesota, from being "organizations," we cannot conclude that the district court erred in determining that the banks were "organizations" under the definition. Appellant's third argument, that there is no statutory requirement that a State or political subdivision operate in interstate commerce, is irrelevant because we have indicated that the City of Shoreview and University of Minnesota were not the entities defined as "organizations" for purposes of the statute.

B. Did Government fail to prove that five or more of the documents charged in Count III affected interstate commerce?

Jackson appeals his conviction under Count III, which charged possession of five or more identification documents in violation of 18 U.S.C. § 1028(a)(3), alleging that the Government failed to prove that five or more of the documents listed in Count III were "in or affecting interstate commerce." The documents charged in Count III are a series of drivers licenses, all but one of which were issued by the State of Minnesota. Jackson claims that because there was no evidence that five or more of the licenses had crossed a state line, the evidence was insufficient to establish the interstate commerce element listed in § 1028(c)(3).

Again, the standard of review on a claim of insufficient evidence is stringent. We review the evidence in the light most favorable to the jury's verdict, Jenkins, 78 F.3d at 1287, and give the verdict the benefit of all reasonable inferences that might be drawn from the evidence. Gaines, 969 F.2d at 696; Logan, 49 F.3d at 359.

We first note that the statute does not require the Government to prove that five or more of the documents were "in or affecting interstate commerce," as Jackson alleges. Instead, technical wording requires that the "production, transfer, or possession prohibited by this section is in or affects interstate or foreign commerce[.]" § 1028(c)(3) (emphasis added).

We do not agree with Jackson's contention that the statute requires a showing that the documents traveled in interstate commerce. Indeed, the statute presents two options: possession may be "in" interstate commerce or it may "affect" interstate commerce. Id. The Government demonstrated that Jackson's possession affected interstate commerce by proving that possession of the stolen driver's licenses was integral to his scheme to defraud businesses and banks operating in interstate commerce. The requirement of § 1028(c)(3) is not as stringent as Jackson would have us believe. See United States v. Pearce, 65 F.3d 22, 24 (4th Cir. 1995)(deciding that court did not err when it did not instruct the jury that the Government was required to prove that every document-making implement had made its way into interstate commerce).

C. Did Count II charged the same crime as Count III?

Jackson challenges his conviction on Counts II and III, which were charged under 18 U.S.C. § 1028(a)(3), claiming that they charge the same crime – possession of five or more identification documents. Appellant did not raise this issue prior to trial and therefore has failed to preserve it for appeal. United States v. Shephard, 4 F.3d 647, 650 (8th Cir. 1993)(An objection to an indictment on grounds of multiplicity or double jeopardy is waived if not raised before trial.), cert. denied, 510 U.S. 1203 (1994). Therefore, this court will affirm the conviction unless (1) the district court made an error, (2) the error was plain under current law, meaning clear and obvious, and (3) the error was prejudicial and affected the trial outcome. United States v. Olano, 507 U.S. 725, 732-36 (1993). The court should only correct the error if the error results in a miscarriage of justice or seriously affects the fairness, integrity, or public reputation of the judicial proceedings. Id. at 736; United States v. Wivell, 893 F.2d 156, 161 (8th Cir. 1990.

The Double Jeopardy Clause of the Constitution provides three related

protections: protection against a second prosecution for the same offense after acquittal; protection against a second prosecution for the same offense after conviction; and protection against multiple punishments for the same offense. Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). In this case, Jackson contends that his convictions violate the Double Jeopardy Clause's prohibition against multiple punishment for the same offense.

The Supreme Court has stated the applicable rule and the Double Jeopardy Clause in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

284 U.S. 304, 52 S.Ct. at 182. "If each [offense] requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975).

We do not reach the legal argument presented by Jackson: whether Count II and Count III charge the same crime. This is because our standard of review limits us unless the district court made an error which was plain under current law, meaning clear and obvious, and the error was prejudicial and affected the trial outcome. Olano, 507 U.S. at 732-36. First, we cannot find that the district court made a plain error in maintaining both counts. The argument exists that an additional fact (i.e. an interstate commerce nexus) is required for a conviction for fraudulent use of state identification documents under 18 U.S.C. § 1028(c)(3), and comparatively, a conviction for fraudulent use of federal identification documents requires proof of a separate kind: that the documents were or appeared to be issued under the authority of the United States, 18 U.S.C. § 1028(c)(1). We also conclude that the trial outcome was not

prejudiced. Because Jackson was sentenced on four counts, all to run concurrently, the issue of sentencing on one or both counts would not change the amount of time he has been committed to serve. Because we do not find that plain error has been committed by the district court, we deny Jackson's motion to overturn his convictions on the basis of the Double Jeopardy Clause.

D. Was the amount of loss was based on speculation?

Jackson appeals the loss calculation representing an estimate of the loss Jackson intended to inflict using yet uncashed checks. The government had the burden of proving the amount of loss by a preponderance of the evidence. See United States v. Mills, 987 F.2d 1311, 1315 (8th Cir.), cert. denied. 510 U.S. 953 (1993). In the case of fraud or theft, the loss " 'need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.' " Chappell, 6 F.3d at 1101(quoting U.S.S.G. S 2F1.1 cmt. 8). A court's estimate of loss "may be based upon the approximate number of victims and the average loss to each victim, or on more general factors such as the scope and the duration of the offense." U.S.S.G § 2B1.1., comment n.3. The Guidelines further provide that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment n.7. Loss determinations are reviewed for clear error; as long as the determination is plausible in light of the record as a whole, clear error does not exist. United States v. Sowels, 998 F.2d 249, 251 (5th Cir.1993), cert. denied, 510 U.S. 1121, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994).

At trial, co-conspirators Hawkins, Osborn and Olson testified that they negotiated the first few checks in each stolen checkbook for Jackson's benefit, and kept the remainder for their own use. Tr. at 181, 188, 235-36, 389-91. They testified that checks were negotiated in amounts varying from $100 to more than $800. Hawkins testified that she usually cashed checks for just under $500, because Jackson told her

that Target had a policy of cashing any check under that amount. Tr. at 193-94. Hawkins and Osborn testified that they had been involved in this scheme for approximately five years. See Tr. at 187 (Hawkins testified as to her involvement from April 1990 or 1991 to December 1995); Tr. at 238 (Osborn testified as to her involvement from 1991 until 1995).

From this testimony, the PSR estimated that co-conspirators used approximately three checks from each stolen checkbook for Jackson, purchasing items of approximately $2,000 total value with the three checks. The PSR further estimated that the co-conspirators purchased items worth about $450 with each of the remaining checks.

We uphold the district court's conclusion that there was substantial evidence of Jackson's pattern and practice of fraudulent check negations over a period of years, and that the losses attributable to Jackson's past transactions in stolen personal checks were evidence of his likely intent with respect to the blank checks.

E. Was the enhancement for obstruction of justice supported by reliable evidence?

Jackson complains that unreliable hearsay evidence was used by the Government in support of an enhancement for obstruction of justice. At the sentencing hearing, Hawkins testified that prior to trial Jackson had contacted her twice through two different mutual friends, first to tell her to return anything she received from federal agents unopened, and second to tell her that he knew where she lived, that he had family living around the corner if he wanted to do anything to her, he thought she was trying to send him away for a long time, and he just wanted to talk to her. Evidence was also presented that during or around the time of trial, both Hawkins and Osborn received a series of unexplained hang-up phone calls with no response from the caller at the other end of the line.

The Sentencing Guidelines permit the use of hearsay without regard to its admissibility at trial, provided that it has sufficient indicia of reliability to support its probably accuracy. United States v. Campos, 87 F.3d 261, 264 (8th Cir.), cert denied, 117 S.Ct. 536 (1996). Uncorroborated hearsay evidence is a proper topic for the court's consideration as long as the defendant is afforded an opportunity to explain or rebut the evidence. United States v. Wise, 976 F.2d 393, 402 (8th Cir. 1992), cert. denied, 507 U.S. 989 (1993).

The District Court found that Hawkins' testimony was credible and supported an enhancement for obstruction of justice. Sentencing Tr. at 33-34. However, it found no casual connection between Jackson and the hang-up calls. Id.

We review factual findings in sentencing for "clear error." United States v. Elliot, 89 F.3d 1360, 1370 (8th Cir. 1996); United States v. Morris, 18 F.3d 562, 570 (8th Cir. 1994). We find no reason to disagree with the district court's findings as to the two-point enhancement based on Hawkins' testimony.

F. Did the district court judge err in entering the restitution order ?

The district court ordered restitution to be paid to Target Stores in the amount of $20,918.47, and ordered to $26,449.28 to be paid to other victims. Jackson now appeals the restitution order. Because Jackson failed to object to the restitution order at the sentencing hearing, we review this issue for "plain error resulting in a miscarriage of justice." Wivell, 893 F.2d at 161; Shephard, 4 F.3d at 650; Olano, 507 U.S. at 732-36.

Jackson cites Hughey v. United States for his proposition that the amount of restitution must be limited to loss caused by the specific conduct which formed the basis for the conviction. 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990). In Hughey, the United States Supreme Court dealt with the interpretation of

the restitution provisions of the Victims and Witness Protection Act of 1982 (VWPA). Hughey Court reversed a restitutionary sentence which had been based on the total loss attributable to all counts in an indictment charging unauthorized use of credit cards and theft by a Postal Service employee, rather than on the loss attributable to the one count to which Hughey had pled guilty.

Jackson argues that pursuant to Hughey, restitution cannot be imposed for any amount of loss caused by the counterfeit payroll check scheme beyond the $8,000 loss itemized in Count I of the indictment and proved at trial. He asserts that restitution cannot be based on the unproved checks because they were not charged in the indictment and not proved at trial.

Subsequent to the Hughey decision, the 18 U.S.C. § 3663 was amended. Currently, both § 3663(a)(2) and § 3663(A)(a)(2) provide that the district court may order restitution to every victim directly harmed by the defendant's conduct "in the course of the scheme, conspiracy, or pattern of criminal activity" that is an element of the offense of conviction, without regard to whether the particular criminal conduct of the defendant which directly harmed the victim was alleged in a count to which the defendant pled guilty, or was even charged in the indictment. United States v. Manzer, 69 F.3d 222, 230 (8ᵗʰ Cir. 1995); United States v. Wesland, 23 F.3d 205, 207 (8ᵗʰ Cir.), cert. denied, 513 U.S. 1045 (1994).[3] In Manzer, this court permitted restitution

---

[3]Jackson argues that the Mandatory Victim Restitution Act of 1996 (MVRA) should not have applied to this case because the offense concluded in December 1995 rather than November 1996, and because the MRVA is not retroactively applicable. We will not entertain the issue of whether the MVRA or the previous restitution statute apply because the statutory language providing for determination of amount of loss is the same. Both state: that the order of restitution "shall require that such defendant – in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense – . . . pay an amount equal to the greater of the value of the property on the date of the damage, loss, or destruction; or the value of the property on

awards encompassing all the acts encompassed in the conspiracy, not just the specific acts alleged in the indictment.  Id. at 230.  "[W]e look to the scope of the indictment in order to determine whether it details a broad scheme encompassing transactions 'beyond those alleged in the counts of conviction."  Id., quoting Wesland, 23 F.3d at 207.

Jackson's fraudulent scheme encompassed checks beyond the University of Minnesota and City of Shoreview payroll checks listed in the indictment and caused losses to Target beyond the $8,000 alleged in Count I.  Jackson's scheme to defraud therefore brings the losses within the outer limits of a permissible restitution order.

Although we do not agree with Jackson's contention that restitution cannot be ordered to Target for more than the $8,000 alleged in Count I, we do reverse and remand for entry of a different restitution amount for Target.  The Government concedes the amount of restitution awarded to Target was in error.  Because the Government disputed the amount of the Brown & Bigelow checks and the Government elected not to present any evidence at the sentencing hearing, the restitution award should be reduced by $10,155.47, the amount of the Brown & Bigelow checks.  Therefore, the amount of restitution ordered paid to Target is $10,763.00

Jackson's last restitution argument is that the nature of the figures to be paid to the unnamed individuals is impossible to determine based on the information contained in the record.  Jackson claims these people were not "victims" of the offense of conviction, but only "victims" of unconvicted conduct. We disagree.  The individuals were named; they were identified in the PSR as the people whose checkbooks, driver's licenses, credit cards, and social security cards were stolen in furtherance of the

_____

the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned[.]"  See 18 U.S.C. § 3663(b)(1)(B); 18 U.S.C. § 3663A(b)(1)(B).

-13-

scheme. Contrary to Jackson's assertion, they were "victims." Section 3663A(a)(2) defines a victim as a "person directly and proximately harmed" as a result of the commission of a crime for which restitution may be ordered "including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity" any person directly harmed by a defendant "in the course of the scheme, conspiracy, or pattern." Id. Those whose checkbooks, driver's licenses, credit cards, and social security cards were stolen in furtherance of the scheme were directly harmed by the loss those possessions, and for some, as a result of the break-ins that allowed access to the licenses, checkbooks, and/or credit cards. Restitution as to these victims was therefore proper.

## III. CONCLUSION

For the reasons set forth above, we affirm in part and reverse in part the decision of the district court. We further order the amount of restitution ordered paid to Target reduced by $10,155.47, for a total of $10,763.00 in restitution to Target.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.