# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3178

_____

United States of America,        *

                               *

         Appellee,       *

                               *  Appeals from the United States

     v.                   *  District Court for the Eastern District

                               *  of Missouri.

Walid Ihmoud,           *

                               *

         Appellant.      *

_____

No. 05-3185

_____

United States of America,        *

                               *

         Appellee,       *

                               *

     v.                   *

                               *

Mohammad Almassri,     *

                               *

         Appellant.      *

_____

No. 05-3270
_____

United States of America,                    *
                                             *
       Appellee,                      *
                                             *
v.                                           *
                                             *
Charles D'Ary,                               *
                                             *
       Appellant.                     *

_____

No. 05-3522
_____

United States of America,                    *
                                             *
       Appellee,                      *
                                             *
v.                                           *
                                             *
Zeyad Abdeljabbar,                           *
                                             *
       Appellant.                     *

_____

Submitted: May 18, 2006
Filed: July 21, 2006
_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

After a jury trial in district court,[1] Walid A. Ihmoud, Mohammad Almassri, Charles D'Ary, and Zeyad A. Abdeljabbar were convicted of numerous charges related to a series of building fires. They appeal. *See* **28 U.S.C. § 1291; 18 U.S.C § 3742**. This court affirms.

I.

Abdeljabbar owned a strip mall in St. Louis, Missouri. He also co-owned a grocery store, Sterling's Marketplace, in the strip mall. In February 2000, a fire damaged the store. Abdeljabbar received $123,250 in insurance proceeds. Abdeljabbar then dissolved his partnership with the co-owner, and sold the property to a third party.

In August 2002, a fire damaged Quality Bargains, a store operated by Ihmoud and located at Abdeljabbar's strip mall. Ihmoud received $300,010 in insurance proceeds.

By October 2002, Abdeljabbar had opened three grocery stores under the name of St. Louis Supermarkets. Ihmoud and Abdeljabbar went into business together, opening a fourth St. Louis Supermarket where the Sterling's Marketplace had been (the "Broadway store"). There, they sold merchandise from Quality Bargains.

James Huddleston, an employee at the Broadway store, testified that Ihmoud asked him in January 2003 to burn the car of a jewelry-store owner whom Ihmoud suspected of vandalizing his car. James, with his brother William, poured gasoline on the vehicle but could not ignite it. Nevertheless, Ihmoud paid James $250 for the effort.

---

[1]The Honorable Stephen N. Limbaugh, Sr., United States District Judge for the Eastern District of Missouri.

Jame's other brother, Eldgre, also worked for St. Louis Supermarkets. Eldgre testified that Abdeljabbar approached him in the spring of 2003 about burning the four St. Louis Supermarkets in exchange for about $31,000. Eldgre agreed, and recruited his nephew to help.

James testified that, in May 2003, Abdeljabbar asked him to come to a meeting. The meeting was attended by all four appellants—Abdeljabbar, D'Ary, Almassri, and Ihmoud. Abdeljabbar said that he wanted the four St. Louis Supermarkets to be burned, because they were losing money. Abdeljabbar wanted them burned at the same time, but before July 4. According to James, D'Ary suggested they be burned by the same method as the Quality Bargains fire. James was supposed to help D'Ary and Almassri burn the Broadway store. In exchange, James would be paid $3,000 to $5,000.

A few days later, Abdeljabbar told James to contact Ihmoud if he needed to know how to burn the Broadway store. Later, D'Ary informed James that he was going to use a white candle with a long wick to burn the Broadway store, because that is how he burned Quality Bargains.

On June 8, D'Ary set fire to the Broadway store, but firefighters responded and damage was minimal. Ihmoud instructed D'Ary, Almassri, and James to take merchandise off the shelves and break it near the location of the fire, to "increase his insurance money." Abdeljabbar and Ihmoud ultimately made a $1,205,000 insurance claim.

Later that month, Abdeljabbar asked James to burn Abdeljabbar's car. James, with his brother William, doused the car with gasoline and burned it. Abdeljabbar paid James $250, later collecting $21,000 in insurance payments.

On July 2, Eldgre and his nephew met Almassri at the Broadway store in order to burn it. They carried gasoline jugs to the roof. Almassri and Eldgre's nephew then began chopping holes in the roof. However, the three left the store without starting

-4-

the fire, leaving the jugs there. According to Eldgre, they agreed to return later that night to start the fire, but they did not follow through.

The next day a maintenance worker discovered the jugs and the holes. His supervisor insisted that the police be called. The police arrived and opened an investigation.

On July 10, D'Ary again set fire to the Broadway store. Investigators seized videos from the store's surveillance system. James testified that D'Ary later told him that he started the fire in a location he thought would burn quickly. Ihmoud made a $250,000 insurance claim.

Jose Rodriguez, an employee of St. Louis Supermarkets, testified that in July, Abdeljabbar asked him to burn the South Grand store in exchange for $10,000. Abdeljabbar told Rodriguez he wanted the store burned to collect insurance money. Rodriguez, with a friend, went to the store on July 20. As they approached it, they changed their minds and went home.

The other two St. Louis Supermarkets burned that night. Investigators seized surveillance tapes from each store. Abdeljabbar filed insurance claims for each of these fires.

Eldgre was arrested after a police officer recognized him from the surveillance video from the July 3 burning of the Broadway store. He agreed to cooperate by wearing a recording device. On July 23, 2003, he met with Abdeljabbar, recording his statement that he would cut his throat if he said anything to anyone.

After a trial, the jury found all four defendants guilty of conspiracy to commit arson; Ihmoud and Abdeljabbar of mail fraud, arson, and arson in furtherance of mail fraud; D'ary of arson; and Abdeljabbar and Almassri of attempted arson.

II.

A.

Ihmoud argues there is insufficient evidence to convict him of arson in furtherance of mail fraud under 18 U.S.C. § 844(h)(1), which punishes anyone who "uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States."

Evaluating sufficiency, this court views the evidence most favorably to the Government, including all reasonable inferences from the evidence. *See United States v. Drews*, 877 F.2d 10, 13 (8th Cir. 1989). This court reverses "only if the jury must have had a reasonable doubt about an essential element of the crime." *United States v. McDougal*, 137 F.3d 547, 553 (8th Cir. 1998).

Ihmoud first contends that the evidence does not show that he "knew, on July 10, 2003, that an intentionally set fire was the means to commit the fraud on the insurance company." The record refutes this contention. James Huddleston testified that Ihmoud attended the May 2003 meeting where Abdeljabbar said he wanted all four stores burned because they were losing money. Later, Abdeljabbar told James that, if he needed to know anything about how to burn the Broadway store, he could contact Ihmoud. Because the fire was only partly successful, Ihmoud instructed D'Ary, Almassri, and James to take merchandise off the shelves and break it to "increase his insurance money." Abdeljabbar and Ihmoud then made a $1,205,000 insurance claim. The evidence supports the jury's finding that Ihmoud knew that the purpose of the arson was to defraud the insurance company.

Ihmoud also argues that there is insufficient evidence that he "used" fire within the meaning of the statute. Citing no authority, Ihmoud strongly implies that one "uses" fire only when one personally starts the fire.

This court has not interpreted the meaning of the word "uses" in the statute. However, relying on dictionary definitions, the Supreme Court concluded that the same term in another statute is "variously defined as '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" *Bailey v. United States*, 516 U.S. 137, 145 (1995), *quoting Smith v. United States*, 508 U.S. 223, 228-29 (1993) (citations and internal quotation marks omitted). Under the plain meaning of the word, therefore, one can "use" fire without actually starting it. *See United States v. Ruiz*, 105 F.3d 1492, 1501, 1503-04 (1st Cir. 1997) (finding that two defendants "used" fire under 18 U.S.C. § 844(h)(1), although one of them merely "assisted [the other defendant] . . . by providing access to the store and by failing to engage the alarm."). Ihmoud's participation in the May meeting, combined with his insurance claim, is sufficient to show that he "used" fire to carry out fraud.

B.

Ihmoud argues that the district court erred in admitting evidence that he hired James to burn the jewelry-store-owner's car. Ihmoud asserts that "there was no evidence that the Ihmoud car fire was part of a common scheme or plan related to or having any nexus to the charged offenses."

The district court has broad discretion to admit evidence of other crimes. *United States v. Thomas*, 398 F.3d 1058, 1062 (8th Cir. 2005), *citing United States v. Mays*, 822 F.2d 793, 797 (8th Cir. 1987). This court reviews the district court's ruling for abuse of discretion and will "reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *United States v. Howard*, 235 F.3d 366, 372 (8th Cir. 2000), *quoting United States v. Brown*, 148 F.3d 1003, 1009 (8th Cir. 1998).

Under Rule 404(b), evidence of a prior crime, though inadmissible to show that a person acted in conformity with the prior act, may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity,

or absence of mistake or accident." **Fed. R. Evid. 404(b)**; *see also **United States v. Burke***, 425 F.3d 400, 409 (8th Cir. 2005) ("While evidence of a defendant's prior bad conduct may not be admitted for purposes of showing action in conformity therewith, it may be used to show motive or a common scheme or plan."). Such evidence is admissible if it is (1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) proved by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value. ***United States v. Carroll***, 207 F.3d 465, 469 n.2 (8th Cir. 2000); *see also **United States v. Jackson***, 278 F.3d 769, 771 (8th Cir. 2002).

The evidence, established by a preponderance, is relevant to material issues and similar to the crimes charged. In particular, the car fire is similar to the June burning of Abdeljabbar's car. Both car fires were carried out by James and William Huddleston, who used similar techniques. The fires were also close in time. The first occurred on January 16—just five months before Abdeljabbar's car was burned. Although "[t]here is no absolute rule for the number of years that can separate evidence of offenses admitted under Rule 404(b)," this court has approved the admission of other crimes evidence for acts committed up to 13 years before the crime charged. ***Thomas***, 398 F.3d at 1063. Finally, Ihmoud paid James $250 for his efforts—the same amount Abdeljabbar paid him. Thus, the evidence is highly probative to showing a conspiracy between Abdeljabbar and Ihmoud, who chose the same people to carry out similar criminal acts for the same pay.

Ihmoud argues that the district court erred in admitting evidence of the 2000 fire at the Broadway location. At the time of that fire, the Broadway store was owned by Abdeljabbar and a third party; Ihmoud had no interest in the property and no business dealings with Abdeljabbar. Ihmoud concludes that the evidence is irrelevant and prejudicial.

This court disagrees. Although Ihmoud was not involved in the 2000 fire, a co-conspirator, Abdeljabbar, was. Evidence of pre-conspiracy conduct carried out by someone other than the defendant is admissible to show "the establishment and

structure of the conspiracy." ***United States v. Garrison***, 168 F.3d 1089, 1094 (8th Cir. 1999), *citing* ***United States v. Rodrequez***, 859 F.2d 1321 (8th Cir. 1988). The evidence shows how Abdeljabbar established a scheme to burn buildings for insurance proceeds. Because Abdeljabbar collected insurance proceeds from the 2000 fire, the jury could infer that this success motivated Ihmoud to join the conspiracy three years later.

Any prejudice from the evidence of the 2000 fire was limited by the court's instruction to the jury that they "may not use this similar acts evidence to decide whether a defendant carried out the acts involved in the crime charged in the indictment" and that, to find the defendant guilty, they "must first unanimously find beyond a reasonable doubt based on the rest of the evidence that will be introduced in this case that a defendant carried out the acts involved in the crime charged in the indictment." *See* ***United States v. Thomas***, 398 F.3d 1058, 1063 (8th Cir. 2005) ("[T]he use of a limiting instruction decreases the danger that unfair prejudice will result from admission of the evidence.") (citation omitted).

Because Ihmoud has not shown that the 404(b) evidence "clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts," this court concludes that the district court did not abuse its discretion in admitting it. *See* ***Howard***, 235 F.3d at 372, *quoting* ***Brown***, 148 F.3d at 1009.[2]

---

[2]Even if there were error, it was harmless. Ihmoud's conviction is well-supported by the evidence at trial, particularly his attendance at the May meeting and his instructions to take merchandise off the shelves and break to increase his insurance money. *See* ***United States v. Mack***, 343 F.3d 929, 935 (8th Cir. 2003) (finding that admission of prior bad acts evidence was harmless).

C.

The court gave two instructions about arson in furtherance of mail fraud. Instruction 31 says:

> Counts XV, XVI and XVII of the indictment are based upon a statute which is Federal law, Title 18, United States Code, Section 844(h)(1), which reads, in pertinent part, as follows:
> > Whoever uses fire . . . to commit any felony which may be prosecuted in a court of the United States [has committed a violation of Federal law.]

Instruction 32 says:

> The crime of Arson in Furtherance of Mail Fraud as charged in Counts XV, XVI and XVII of the indictment, has two essential elements, which are:
> > One, the defendant used fire;
> > Two, the fire was used to commit a felony that can be prosecuted in a Federal Court.

Abdeljabbar argues that Instruction 32 erroneously permits a jury to conclude that the arson itself can qualify as the "felony." For the same reason, Ihmoud objects to the phrase "any felony" in Instruction 31. Both appellants contend that the district court should have specified that the alleged "felony" is mail fraud, not arson.

These objections were not raised in the district court. This court reviews for plain error, affirming if the instructions, "taken as a whole," "adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government." *United States v. Rice*, 449 F.3d 887, 895 (8th Cir. 2006) (internal quotation marks and alterations omitted).

The instructions meet that standard. Any confusion from Instruction 31's phrase "any felony" is cleared up by Instruction 32. By specifically saying "The

-10-

Crime of Arson in Furtherance of Mail Fraud," Instruction 32 clarifies that the "felony" at issue is mail fraud. Likewise, the verdict form asks the jury to decide whether the defendants are guilty of "ARSON IN FURTHERANCE OF MAIL FRAUD."

Abdeljabbar also argues that "the jury should have been instructed that 'to commit' was a separate element of arson in furtherance of a felony." Abdeljabbar asserts that Instruction 32 permits the jury to find guilt without a nexus between the arson and the felony.

The instruction does not amount to clear error. It asks the jury to decide whether "the fire was used *to commit* a felony." (emphasis added). That language requires considering whether there was a causal nexus. Taken as a whole, the instructions adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government. *See id.*

To the extent that there is ambiguity in the instructions, it is harmless. The evidence at trial overwhelmingly demonstrates that the purpose of the fire was to commit mail fraud by fraudulently collecting insurance payments. In particular, the discussion at the May meeting and the instructions about collecting insurance money independently support the convictions. *See Mack*, 343 F.3d at 935.

D.

At trial, the Government examined a law enforcement officer who testified about surveillance videotape from the buildings. The officer had prepared a log with brief descriptions of various scenes in the video. Although most log entries are objective, some are subjective and speculative. One entry states: "Chuck [D'Ary] walking in storage room looking at roof (where to place holes?)" This speculates about what D'Ary was thinking at the time. Another entry says: "Eldger [Huddleston]

-11-

and Mike [Almassri] go to car to get hatchet." This speculates about the purpose of the trip to the car. When the two defendants return to the scene, the entry states: "Eldger and Mike walking in back (Eldger with hatchet behind his". The hatchet is apparently not visible in the video. Another entry says: "Mike [Almassri] sweeps nonchalantly toward backroom." This subjectively characterizes Almassri's movement.

The defendants objected to the introduction of the officer's characterizations, arguing that some were unfairly prejudicial. The Government responded that, although the officer would need to use the log while testifying, there was no need to show it to the jury. The court informed counsel that it would defer ruling on the objections until the testimony.

After the officer's testimony, the Government moved to admit the log "albeit not for publishing." The court admitted the log into evidence.

During jury deliberations, the parties discovered that the log had been sent back to the jury. The defendants moved for mistrial or curative instruction, but these motions were denied. D'Ary and Almassri now argue that they are entitled to a new trial.

Even if publishing the log to the jury were error, this court finds it harmless. The jury saw the videotape itself, including the scenes that were subjectively characterized. Any inaccuracies in the log's descriptions are exposed by viewing the tape. In addition, the jury's finding of D'Ary and Almassri's guilt is well-supported by other evidence. James Huddleston testified that both D'Ary and Almassri attended the May meeting, where D'Ary suggested that the fires be started the same way as the Quality Bargains fire. James also testified that D'Ary admitted setting fire to the Broadway store on June 8. Because that fire was unsuccessful, D'Ary and Almassri took merchandise off the shelves and broke it. Eldgre Huddleston testified that

-12-

Almassri met him on July 2 to burn the Broadway store. Almassri carried gas jugs to the roof, and then chopped holes in it. According to James's testimony, after the original plan to burn the Broadway store was foiled, D'Ary returned and burned it on July 10, 2003. Any error in publishing the log was harmless. *See id*.

E.

According to Abdeljabbar, the district court erred in concluding that it was required to run consecutively his sentences for the multiple arson convictions. The district court relied on 18 U.S.C. § 844(h) (emphasis added):

> Whoever–
>      (1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or
>      (2) carries an explosive during the commission of any felony which may be prosecuted in a court of the United States,
> including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years. In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, *nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment* including that imposed for the felony in which the explosive was used or carried.

The district court rejected Abdeljabbar's argument that the phrase "any other term of imprisonment" implicitly excludes arson. By his argument, a defendant convicted of multiple counts of arson can be sentenced concurrently, while a defendant who used fire to commit any crime except arson shall be sentenced consecutively.

-13-

This court has never addressed this argument in the context of § 844(h). This court has interpreted 18 U.S.C. § 924(c)(1), a firearms statute with nearly identical language. That statute, at the time this court interpreted it, stated: "nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried." *Id.* In *United States v. Davis*, 103 F.3d 660, 667 (8th Cir. 1996), the defendant was convicted of three robberies. This court rejected his argument that the district court erred in imposing consecutive sentences under § 924(c)(1). This court held that the "express language of the statute prohibits the district court from allowing the firearms terms of imprisonment to run concurrently with each other or with the underlying crime of violence." *Id.*; *see also United States v. Allee*, 299 F.3d 996, 1003-04 (8th Cir. 2002) (following *Davis*).

The express language of § 844(h) – just like § 924(c)(1) – categorically prohibits concurrent sentences for "any other term of imprisonment." The district court did not abuse its discretion in running Abdeljabbar's sentences consecutively.

F.

Ihmoud argues that his sentence for multiple counts violates the Double Jeopardy Clause. The Government responds that this court declines to review double jeopardy arguments not raised before the district court. *See United States v. High Elk*, 442 F.3d 622, 624 (8th Cir. 2006); *United States v. Santana*, 150 F.3d 860, 863-64 (8th Cir. 1998); *United States v. Goodwin*, 72 F.3d 88, 91 (8th Cir. 1995); *United States v. Shephard*, 4 F.3d 647, 650 (8th Cir. 1993); *United States v. Garrett*, 961 F.2d 743, 748 (8th Cir. 1992); *United States v. Herzog*, 644 F.2d 713, 716 (8th Cir. 1981); *United States v. Conley*, 503 F.2d 520, 521 (8th Cir. 1974). However, this court has also reviewed such arguments for plain error, even if the defendant failed to raise the claim earlier. *See United States v. Washburn*, 444 F.3d 1007, 1010 (8th Cir. 2006); *United States v. Sickinger*, 179 F.3d 1091, 1092-93 (8th Cir. 1999);

-14-

*United States v. Jackson*, 155 F.3d 942, 947 (8th Cir. 1998); *United States v. Uder*, 98 F.3d 1039, 1045 (8th Cir. 1996).

This case does not require resolving any inconsistencies among these cases, because Ihmoud's argument fails even under plain error review. Under the plain error standard, the conviction is affirmed "unless (1) the district court made an error, (2) the error was plain under current law, meaning clear and obvious, and (3) the error was prejudicial and affected the trial outcome." *Jackson*, 155 F.3d at 947, *citing United States v. Olano*, 507 U.S. 725 (1993). "The court should only correct the error if the error results in a miscarriage of justice or seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.*

In this case, the key to double jeopardy analysis is "whether Congress 'intended that each violation be a separate offense.'" *United States v. Bennett*, 44 F.3d 1364, 1373 (8th Cir. 1995), *quoting Garrett v. United States*, 471 U.S. 773, 778 (1985). If Congress so intended, there is no double jeopardy violation.

This court has held that Congress intended 18 U.S.C. § 844(h) to allow prosecution for both the crime of using fire to commit a felony, and the felony itself. *See United States v. Shriver*, 838 F.2d 980, 982 (8th Cir. 1988). Ihmoud's conviction for conspiracy does not change the analysis. "It is well settled that no double jeopardy violation occurs when a person is convicted of conspiracy and a substantive overt act of the conspiracy." *United States v. Cerone*, 830 F.2d 938, 944 (8th Cir. 1987). This court finds no plain error in Ihmoud's conviction and sentencing for arson, conspiracy to commit arson, and arson in furtherance of mail fraud.

III.

The judgments are affirmed.

_____

-15-