# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3130
_____

United States of America

*Plaintiff - Appellee*

v.

Rodney J. Anderson

*Defendant - Appellant*

_____

No. 13-3131
_____

United States of America

*Plaintiff - Appellee*

v.

Vincent F. Pisciotta

*Defendant - Appellant*

No. 13-3132

United States of America

*Plaintiff - Appellee*

v.

Mark A. Sorrentino

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: October 7, 2014
Filed: April 16, 2015

_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

GRUENDER, Circuit Judge.

In this consolidated appeal, we consider the criminal prosecutions that were brought after a fire damaged the Hereford House, a well-known restaurant in downtown Kansas City. Following a jury trial, Rodney Anderson, Vincent Pisciotta, and Mark Sorrentino were convicted on numerous counts related to the fire. The

district court[1] sentenced Anderson to 180 months' imprisonment, Pisciotta to 240 months' imprisonment, and Sorrentino to 180 months' imprisonment. All three defendants now appeal. We affirm.

## I. Background

At about 12:44 a.m. on October 20, 2008, an explosion occurred inside the Hereford House. The resulting fire caused substantial damage. Based upon surveillance footage and security-system records from the restaurant, it soon became clear that this explosion and fire were no accident. Surveillance footage from less than an hour before the incident showed an individual, wearing dark clothes and a hat, enter the restaurant's front door. The individual proceeded to open a back entrance to the restaurant, where a van with two other individuals arrived. The individuals unloaded fourteen containers of gasoline, and two of the individuals placed them throughout the restaurant. An ignition device was set, and the three individuals quickly left, departing mere minutes before the explosion and fire.

When the suspects entered the restaurant that night, the security code of a former Hereford House employee was used to deactivate the security system. Between the employee's firing and the fire, this same security code had been used to deactivate the security system on two other occasions. It was first used on Saturday, September 27, 2008 at 6:47 a.m. Surveillance footage from that morning showed Rodney Anderson, a part owner of the Hereford House, unlock and enter the restaurant's front door. Although Anderson had his own security code, he did not use it on this particular morning. A short time later, another individual, clad in a dark jacket and hat, arrived. Anderson provided this individual with a key and watched as he entered and exited the restaurant. For the next fifty or so minutes, Anderson

---

[1]The Honorable Greg Kays, Chief Judge, United States District Court for the Western District of Missouri.

showed the individual around the restaurant, stopping to point out various things—including the back entrance that the arsonists would use less than a month later.

The former employee's security code was used again about a week before the fire, on October 12, 2008 at 11:22 p.m. Surveillance footage showed an individual, wearing dark clothes and a hat, unlock and enter the restaurant's front door. The individual made his way to the back entrance, where two other individuals were waiting. In what appears to be a practice run for the arson, all three individuals walked through the restaurant with flashlights, leaving shortly before midnight. A light-colored car can be seen driving away from the Hereford House at approximately this time.

Agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") investigated the explosion and fire. This investigation naturally focused on identifying the individuals in the surveillance videos and determining their roles in the scheme. Anderson, who was depicted in the September 27 video, had been a part owner of the Hereford House since 1987. Over time, he had become the public face of the restaurant. As time passed, however, the restaurant struggled financially. In the ten months before the fire, Anderson infused roughly $380,000 into the business, which came from cash advances on personal and business credit cards, withdrawals from his mother's IRA and his 401(k), and a loan from his brother-in-law. And during 2007 and 2008, Anderson explored various options to improve the restaurant's prospects, ranging from moving it to another location to selling the building to a developer with a leaseback option. However, both options proved to be dead ends.

Anderson's statements before and after the fire convey the depth of the financial pressures he was facing. After a Hereford House employee helped to suppress a kitchen fire in mid-2007, Anderson responded that he would "just assume [sic] the place burn down." And in an email sent roughly one month before the fire, Anderson

-4-

confided that "[t]hings are going down fast. We were unable to pay our payroll taxes of $50,000. Things are not getting any better. Sales are in the tank. Got me down." Furthermore, during a bankruptcy proceeding several months after the fire, Anderson explained, "All I can tell you is I was very idiotic in doing what I did, and hindsight is 20/20, but you know, there's 450 employees, you've been with them, a lot of them for twenty years, and you do crazy things. That's unfortunately who I am."

Anderson was not in Kansas City at the time of the fire. He returned on the morning of October 20, at which time he spoke with his employees, including James Stanislav. After learning that Stanislav had turned over the surveillance videos from the restaurant to ATF agents, Anderson asked, "So you've been in the cash room?" The cash room, however, contained an active surveillance monitor but only a dummy VCR. Stanislav informed Anderson that the actual video recording equipment was kept in the restaurant's supply closet. Anderson responded to this news with an "Oh," which Stanislav took to mean that Anderson was "surprised or somewhat surprised." Later that day, Anderson told Stanislav that "I might have brought this on us." Stanislav tried to follow up, but Anderson said he could not talk at that time.

The next day, October 21, ATF Special Agent Tony Donaldson interviewed Anderson and asked whether he suspected anyone of setting the fire. At first, Anderson denied knowing anything, but, after looking down and shaking his head, Anderson stated that someone had called him about one month earlier to discuss purchasing the restaurant. After the call, Anderson showed an individual—not the caller—around the restaurant. Anderson did not identify this person, merely describing him as a small, white male with a hat pulled down over his face.

ATF agents also spoke with Stanislav on October 21. With the agents present, Stanislav called the company that maintained the Hereford House's security system. It was at this point that Stanislav and the agents learned that a former employee's security code had been used to deactivate the restaurant's security system immediately

before the fire. Shortly thereafter, Stanislav shared this information with Anderson, who became distraught and stated, "I think I brought this on us. I think this might have happened because of me." When Stanislav inquired further, Anderson told a different story than he had told Special Agent Donaldson. Anderson now explained that he had given a "couple guys" a key and a security code so they could put "hot," *i.e.* stolen, stoves in the restaurant. Around this same time, Anderson called ATF Special Agent Richard Kight and told him a similar version of events.

Shortly after the fire, Stanislav began working with Travelers Insurance ("Travelers"), which insured the restaurant for building and property losses as well as business-interruption losses. Anderson subsequently signed an advance-payment agreement, and Travelers sent an advance payment of $300,000 to the restaurant. Several months after the fire, the restaurant submitted two proofs of loss, one for $962,593 and the other for $1,459,505. Anderson signed documentation to support both of these claims.

Meanwhile, ATF's investigation into the fire continued. In February 2009, investigators publicly released a photograph of the individual who met with Anderson in the restaurant on September 27 and offered a reward for information about the suspect. In March 2009, ATF Special Agent Randy Roberts received information that led to Vincent Pisciotta. To monitor Pisciotta's movements, Special Agent Roberts installed a pole camera outside of Pisciotta's residence, which was in place from May 2009 until June 2011. In reviewing the footage from this camera, Special Agent Roberts became familiar with Pisciotta's appearance as well as the car that Pisciotta drove, a light tan Lincoln Continental. From this footage, Special Agent Roberts also observed Mark Sorrentino visit Pisciotta on several occasions.

As part of his investigation, Special Agent Roberts also interviewed Michael Balano, who knew Anderson, Pisciotta, and Sorrentino. Balano's telephone records showed a call with Sorrentino on September 26, the day before Anderson met with the

-6-

suspect in the restaurant. Balano's telephone records also showed a call with Anderson on September 27, several hours after his meeting with the suspect. The day after Special Agent Roberts interviewed Balano, the pole camera outside of Pisciotta's residence captured a discussion between Pisciotta and Sorrentino. At one point during this conversation, Sorrentino lifted up the front of his shirt and showed his chest to Pisciotta. Pisciotta also looked down the back of Sorrentino's shirt.

After this lengthy investigation, a federal grand jury returned a superseding indictment charging Anderson, Pisciotta, and Sorrentino with conspiracy to commit arson and mail fraud, 18 U.S.C. § 371; arson, 18 U.S.C. §§ 2, 844(i); mail fraud, 18 U.S.C. §§ 2, 1341; and the use of fire to commit another felony, 18 U.S.C. §§ 2, 844(h). During the ensuing jury trial, numerous witnesses identified Anderson in the September 27 surveillance video. Moreover, two of the Government's witnesses identified Pisciotta as the other individual in this video. The jury also learned that Sorrentino's telephone records showed that Sorrentino called Pisciotta approximately fifteen minutes before the September 27 meeting. Additionally, Special Agent Roberts identified both Pisciotta and Sorrentino in the Hereford House surveillance footage.

The Government also called Jenifer Sorrentino, who was married to Mark Sorrentino at the time of the fire. Ms. Sorrentino's identity had been the subject of a protective order, meaning that Anderson, Pisciotta, and Sorrentino did not learn that she was testifying until twenty-four hours before she took the stand. Ms. Sorrentino identified Pisciotta in the September 27 surveillance video, Sorrentino in the October 12 surveillance video, and Pisciotta and Sorrentino in the October 20 surveillance video. Ms. Sorrentino also testified about her recollections from the night of the fire. October 19, Ms. Sorrentino explained, is her birthday, and she remembered having dinner with her then-husband on the night of the fire, October 19, 2008. They returned home from dinner around 9:00 or 9:30 p.m., and her husband left with Pisciotta afterward. Ms. Sorrentino told the jury that Mark Sorrentino returned home

during the early morning hours of October 20 and "scream[ed]" for her to come downstairs. When she did, her husband was "beet red" and smelled like gasoline, a "profoundly unbelievable" smell. Ms. Sorrentino testified that she washed Mark Sorrentino's jeans multiple times in order to remove the smell and had to throw his shoes away.

Mark Sorrentino sought to cross-examine Ms. Sorrentino about an incident in which she intentionally and repeatedly rammed her car into his. Mark Sorrentino also sought to offer eyewitness testimony about this incident. The district court did not allow Mark Sorrentino to do either. However, both Mark Sorrentino and Pisciotta cross-examined Ms. Sorrentino about her bias. Mark Sorrentino also offered evidence that Ms. Sorrentino's player card was used at a casino on the night of the fire, at a time when she told the jury that she was at home. When asked about this evidence, Ms. Sorrentino responded that she "had shared my cards with my mom and my sister and some other people."

The jury found Anderson guilty of conspiracy to commit arson and mail fraud, arson, mail fraud, and the use of fire to commit another felony. In an interrogatory, the jury specified that Anderson's predicate felony for the use-of-fire offense included both mail fraud and conspiracy to commit arson and mail fraud. The jury acquitted Pisciotta and Sorrentino of mail fraud but found them guilty of conspiracy to commit arson, arson, and the use of fire to commit another felony. The jury found that Pisciotta and Sorrentino's predicate felony for the use-of-fire offense was conspiracy to commit arson.

Approximately ten months after trial, Mark Sorrentino filed a motion for a new trial based upon newly discovered evidence, in which Pisciotta joined. The motion explained that, after trial, Mark Sorrentino had subpoenaed Ms. Sorrentino's cell phone records. According to the motion, these records show that Ms. Sorrentino's cell phone received a call from the landline at the Sorrentinos' residence at 2:12 a.m. on

October 20, 2008—when she told the jury that she was at home. In an attached affidavit, Mark Sorrentino averred that he placed this call to his ex-wife because he was looking for her and wanted her to come home. The district court denied Mark Sorrentino and Pisciotta's motion for a new trial.

Anderson, Pisciotta, and Sorrentino now appeal.

## II.    Discussion

### A.    Use of Fire to Commit Another Felony

Anderson, Pisciotta, and Sorrentino challenge their convictions for the use of fire to commit another felony under 18 U.S.C. § 844(h), which provides that "[w]hoever . . . uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States . . . shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years." The jury found that Anderson's predicate felony under § 844(h) included both mail fraud and conspiracy to commit arson and mail fraud. For Pisciotta and Sorrentino, the jury found that their predicate felony was conspiracy to commit arson.

Sorrentino asserts that the crime of conspiracy to commit arson is not a valid predicate felony for a § 844(h) conviction. According to Sorrentino, only crimes that ordinarily are not committed with fire can be a predicate felony for a § 844(h) conviction. We review this issue of statutory construction *de novo*. *United States v. Kirchoff*, 387 F.3d 748, 750 (8th Cir. 2004). As Sorrentino acknowledges, the text of § 844(h) cuts against his argument. A predicate felony under § 844(h) is "*any* felony which may be prosecuted in a court of the United States." 18 U.S.C. § 844(h) (emphasis added); Webster's Third New International Dictionary 97 (2002) (defining "any" as "one indifferently out of more than two: one or some indiscriminately of whatever kind"). This language admits of no limitation. *United States v. Severns*, 559

F.3d 274, 284 (5th Cir. 2009) ("[T]he language of § 844(h)(1) applies to all felonies."). Looking at the text alone, conspiracy to commit arson, which violates 18 U.S.C. § 371, qualifies as "any felony which may be prosecuted in a court of the United States," *id.* § 844(h).

Yet Sorrentino urges us to read "any felony" to exclude conspiracy to commit arson. Doing so, he argues, avoids the redundancy of convicting someone for using fire to commit another felony when the predicate felony—conspiracy to commit arson—"typically" involves the use of fire. Even if such a concern could overcome the clear language of § 844(h), we fail to discern the redundancy that Sorrentino alleges. The Fifth Circuit has explained that "[t]he conspiracy statute is aimed at punishing persons acting in concert to commit an offense," while § 844(h) focuses on "punishing those who make criminal use of fire." *United States v. Riggio*, 70 F.3d 336, 338 (5th Cir. 1995). Indeed, "[c]onspiracy to commit arson does not require that the individual defendant actually use fire." *Id.*; *see* 18 U.S.C. § 371 (requiring, as relevant here, that "one or more of such persons do any act to effect the object of the conspiracy"). Here, for example, the jury determined in response to an interrogatory that several other overt acts were done in connection with the conspiracy, in addition to setting fire to the Hereford House. For this reason, and because of the broad language of § 844(h), we agree with the Fifth Circuit that "conspiracy to commit arson may serve as the predicate felony for a use of fire charge" under § 844(h). *Riggio*, 70 F.3d at 338.

Sorrentino contends that the Seventh Circuit's decision in *United States v. Konopka*, 409 F.3d 837 (7th Cir. 2005), supports his argument. There, the court considered whether arson is a valid predicate felony under § 844(h), *id.* at 839—a complicated issue we do not confront here. The court reasoned that § 844(h) "reflects the view of Congress that . . . felonies effected by means of fire should be punished more severely than felonies effected by other means" and that "the heavy federal penalty for arson . . . is based on precisely the same idea—that fire is abnormally

dangerous." *Id.* This similarity in justifications, the court concluded, meant that Congress did not intend for arson to be a valid predicate felony for a § 844(h) conviction. *Id.* In *dicta*, the court stated that it "seems" that conspiracy to commit arson also is not a valid predicate felony for a § 844(h) offense. *Id.* The *Konopka* court, however, failed to acknowledge the Fifth Circuit's view in *Riggio*, much less rebut its conclusion that conspiracy to commit arson does not necessarily involve the use of fire. *Id.* at 839-40.

This brings us to Anderson, Pisciotta, and Sorrentino's argument that their § 844(h) convictions create impermissible double punishment, in violation of the Double Jeopardy Clause, U.S. Const. amend. V. As relevant here, the Double Jeopardy Clause "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). The Clause, however, "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). As a result, determining whether multiple punishments for the same offense violate the Double Jeopardy Clause is a matter of ascertaining legislative intent. *Garrett v. United States*, 471 U.S. 773, 778 (1985); *Albernaz v. United States*, 450 U.S. 333, 344 (1981).

In some cases, this intent will not be apparent. We employ the analysis from *Blockburger v. United States*, 284 U.S. 299 (1932), in these situations to determine whether Congress intended to authorize multiple punishments. *United States v. Shriver*, 838 F.2d 980, 981-82 (8th Cir. 1988). Under *Blockburger*, we ask "whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. However, *Blockburger* does not provide an all-encompassing rule to be used whenever we need to determine legislative intent. *Shriver*, 838 F.2d at 982. Instead, "*Blockburger* merely provides a means for statutory interpretation in determining whether the legislature authorized the imposition of separate punishments." *Id.* Where there is a clear indication that Congress intended to impose multiple

punishments, the *Blockburger* test is inapplicable. *Garrett*, 471 U.S. at 779 ("[T]he *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress."); *Albernaz*, 450 U.S. at 340 (explaining that *Blockburger* is "not . . . controlling where, for example, there is a clear indication of contrary legislative intent").

With this background in mind, we turn to the double-jeopardy issues raised here. We review Anderson's double-jeopardy challenge *de novo*. *See United States v. Howe*, 590 F.3d 552, 555 (8th Cir. 2009). On appeal, Anderson does not specify what aspect of his punishment violates the Double Jeopardy Clause; he simply acknowledges that our decision in *United States v. Ihmoud*, 454 F.3d 887 (8th Cir. 2006), is adverse to his position. In *Ihmoud*, the defendant was convicted of conspiracy to commit arson, arson, mail fraud, and using fire to commit another felony—namely, mail fraud. *Id.* at 890, 895. We found no plain error in the district court's decision to impose multiple punishments. *Id.* at 895. In reaching this conclusion, we did not apply *Blockburger* but simply reasoned that "Congress intended 18 U.S.C. § 844(h) to allow prosecution for both the crime of using fire to commit a felony, and the felony itself." *Id.* Moreover, we found that the defendant's conviction for conspiracy to commit arson "does not change the analysis." *Id.*

Anderson is situated almost identically to the defendant in *Ihmoud*; the only differences that we can discern in their convictions are that Anderson's conspiracy involved both arson and mail fraud and that the jury found that Anderson's predicate felony for his § 844(h) conviction included both mail fraud and conspiracy. Anderson offers no reason why these differences matter for purposes of the Double Jeopardy Clause, and we discern no basis to conclude that they do. *See United States v. Smith*, 354 F.3d 390, 399-400 & n.12 (5th Cir. 2003) ("[T]he use-of-fire count [under § 844(h)] is adequately supported by the felony of mail fraud, even if not by the conspiracy."). Although *Ihmoud* reviewed this double-jeopardy issue for plain error, 454 F.3d. at 895, applying *Ihmoud*'s rationale here forecloses Anderson's double-jeopardy challenge.

We turn next to Pisciotta and Sorrentino's double-jeopardy challenge. Pisciotta and Sorrentino were convicted of conspiracy to commit arson, arson, and the use of fire to commit another felony—namely, conspiracy to commit arson. They claim that being convicted for using fire to commit conspiracy to commit arson results in impermissible double punishment because they also were convicted of conspiracy to commit arson and arson. The Government contends, and neither Pisciotta nor Sorrentino disputes, that they failed to raise this argument with respect to the superseding indictment before trial. Federal Rule of Criminal Procedure 12(b)(3) provides that a motion alleging "a defect in the indictment" generally must be raised before trial. A double-jeopardy objection is such an alleged defect if it "appears on the face of the indictment." *United States v. Weathers*, 186 F.3d 948, 953-54 (D.C. Cir. 1999); Fed. R. Crim. P. 12(b)(3) (stating that a defect in the indictment that is "then reasonably available" and that "can be determined without a trial on the merits" must be raised before trial); *see also United States v. Herzog*, 644 F.2d 713, 716 (8th Cir. 1981) ("[A] complaint about the multiplicity of an indictment, and its inherent double jeopardy problems, [must] be raised before trial."). The double-jeopardy issue that Pisciotta and Sorrentino now raise appeared on the face of the superseding indictment because it was clear that conspiracy to commit arson could be the predicate felony for a conviction under § 844(h). In fact, Anderson raised such a concern in a pre-trial motion to dismiss the indictment, and the magistrate judge's report and recommendation, which the district court adopted, discussed the double-jeopardy issue that Anderson raised before trial and that Pisciotta and Sorrentino now raise. Rule 12 therefore required Pisciotta and Sorrentino to raise their double-jeopardy argument concerning § 844(h) before trial, as Anderson did.

The effect of this failure poses a complicated question in light of the recent amendments to Rule 12. The Supreme Court has directed that these amendments, which took effect while this matter was on appeal, "shall govern in all proceedings in criminal cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." Order amending Fed. R. Crim. P. (Apr. 25, 2014). Prior to these amendments, we likely would have reviewed Pisciotta and Sorrentino's

double-jeopardy argument for plain error. Our case law concerning the prior version of Rule 12 was not consistent about this point. Although the prior version of Rule 12(e) stated that a double-jeopardy objection not raised before trial is "waive[d]," we reasoned in *United States v. Robertson*, 606 F.3d 943 (8th Cir. 2010), that plain-error review was appropriate where there is "no evidence . . . that [the defendant] intentionally relinquished his double jeopardy claim," *i.e.* he did not waive his claim. *Id.* at 950.

In amending Rule 12, the word "waiver" was removed and the advisory committee explained:

> Although the term waiver in the context of a criminal case ordinarily refers to the intentional relinquishment of a known right, Rule 12(e) has never required any determination that a party who failed to make a timely motion intended to relinquish a defense, objection, or request that was not raised in a timely fashion. Accordingly, to avoid possible confusion the Committee decided not to employ the term "waiver" in new paragraph (c)(3).

Fed. R. Crim. P. 12 advisory committee notes. Because the word "waiver" has been omitted from the current version of Rule 12, our rule from *Robertson*, which asks whether the defendant waived his double-jeopardy objection, no longer holds. Instead, the current version of Rule 12 states that "a court may consider [a] defense, objection, or request [that was not timely raised under Rule 12(b)(3)] if the party shows good cause." Fed. R. Crim. P. 12(c)(3). Applying this good-cause standard here, we find no good cause for Pisciotta's and Sorrentino's failures to raise their double-jeopardy argument before trial. As discussed above, this argument appeared on the face of the superseding indictment. *See United States v. Green*, 691 F.3d 960, 965-66 (8th Cir. 2012) (finding no good cause where the disputed evidence was adduced before trial yet the defendant failed to raise an argument about it before trial). The current version of Rule 12 therefore directs that we need not consider the merits of Pisciotta and Sorrentino's double-jeopardy argument.

However, as noted above, the amendments to Rule 12 did not become effective until this case was on appeal. Order amending Fed. R. Crim. P. (Apr. 25, 2014). The current version of Rule 12 is therefore applicable only if applying it is "just and practicable." *Id.*; *cf. United States v. Duke*, 50 F.3d 571, 575-76 (8th Cir. 1995) (discussing the "just and practicable" standard). We see no reason not to apply the current version of Rule 12 here.

But even if this just-and-practicable standard were not met, Pisciotta and Sorrentino's double-jeopardy argument still fails because Pisciotta and Sorrentino have not established that the district court committed a plain error, as required by *Robertson*'s interpretation of the prior version of Rule 12. *See* 606 F.3d at 950. To satisfy plain-error review, Pisciotta and Sorrentino must show, among other things, that the district court committed an error that was "clear or obvious, rather than subject to reasonable dispute." *See Puckett v. United States*, 556 U.S. 129, 135 (2009). Such an error must be "plain under current law." *Ihmoud*, 454 F.3d at 895 (quoting *United States v. Jackson*, 155 F.3d 942, 947 (8th Cir. 1998)). Consequently, "[t]he district court's ruling will be upheld if the statute and case law do not provide a clear answer, and the appellant's 'claim of error is at least subject to reasonable dispute.'" *United States v. Hinkeldey*, 626 F.3d 1010, 1012-13 (8th Cir. 2010) (quoting *United States v. Pazour*, 609 F.3d 950, 953 (8th Cir. 2010) (per curiam)).

As evidence of an obvious error, Pisciotta and Sorrentino direct us to the Fifth Circuit's decision in *United States v. Corona*, 108 F.3d 565 (5th Cir. 1997). There, the Fifth Circuit engaged in a *Blockburger* analysis to conclude that punishing a defendant for the three convictions at issue here—conspiracy to commit arson, arson, and the use of fire to commit conspiracy to commit arson—violates the Double Jeopardy Clause. *Id.* at 573-74. Pisciotta and Sorrentino urge us to adopt this same *Blockburger* analysis.

Whatever the merits of the Fifth Circuit's decision in *Corona*, they are insufficient to establish an obvious error on the part of the district court. This circuit

has not addressed the issue presented in *Corona*, but we have considered a double-jeopardy challenge to a § 844(h) conviction on two occasions. First, in *Shriver*, we refused to apply *Blockburger* to determine whether convictions for mail fraud and the use of fire to commit mail fraud under § 844(h) violate the Double Jeopardy Clause. 838 F.2d at 981-82. Observing that "the *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress," *id.* at 982 (quoting *Garrett*, 471 U.S. at 779), we found the legislative intent with respect to § 844(h) to be clear enough to obviate the need to apply *Blockburger*, *id.* at 982. Based upon legislative history, we concluded that "Congress intended that the crimes of using fire to commit a felony and the felony itself may be punished cumulatively." *Id.* We built on this conclusion in *Ihmoud*. There, without mentioning *Blockburger*, we relied on *Shriver* to reiterate that "Congress intended 18 U.S.C. § 844(h) to allow prosecution for both the crime of using fire to commit a felony, and the felony itself." 454 F.3d at 895. In light of *Shriver*'s and *Ihmoud*'s conclusions about the clarity of Congress's intent with respect to § 844(h), we are hard pressed to say that the district court committed an error that was plain under current law by not adopting the Fifth Circuit's *Blockburger* analysis to find a double-jeopardy violation.

The language of § 844(h) bolsters this conclusion. As discussed above, the text of the statute provides no limitation on what offenses may serve as a predicate felony. Moreover, the punishment for a § 844(h) conviction must be imposed cumulatively to any punishment given for the predicate felony. 18 U.S.C. § 844(h). As relevant here, § 844(h) provides for a punishment of ten years "in addition to the punishment for [the predicate] felony." *Id.* Additionally, § 844(h) states that its punishment shall not "run concurrently with *any other term of imprisonment* including that imposed for the felony in which the explosive was used or carried." *Id.* (emphasis added). At a minimum, this language demonstrates that Congress contemplated and expressly approved of the imposition of multiple punishments in at least some circumstances.

Even if the district court should have applied *Blockburger*, the unique manner in which the *Corona* court applied *Blockburger* further buttresses our determination

-16-

that the district court did not commit a clear or obvious error. The *Corona* court explained its *Blockburger* analysis as follows: "Where there are more than two statutory provisions at issue, each offense must contain an element not contained in the sum of the elements of the other offenses." 108 F.3d at 572. Applying this sum-of-the-parts *Blockburger* analysis, the *Corona* court concluded that Congress did not intend to allow punishment for all three of the offenses at issue. *Id.* at 572-74. The parties have not pointed us to any decision from the Supreme Court or this court, and we have not located any, that has applied this combination *Blockburger* approach to three offenses.

We are not the first court to recognize the novelty of the *Corona* court's *Blockburger* analysis. The First, Fourth, and Seventh Circuits have done so as well. For example, in *United States v. Patel*, 370 F.3d 108 (1st Cir. 2004), the First Circuit characterized the appellant's argument based on *Corona* as "interesting and novel" and concluded that "[e]ven if this mode of *Blockburger* analysis were appropriate in this case, it likely would not assist [the defendant]." *Id.* at 117; *see also id.* at 118-20 (Lynch, J., concurring in part and concurring the judgment). The Seventh Circuit likewise observed that it "ha[s] not applied [*Corona*'s] combination approach to *Blockburger* in similar circumstances" and underscored that "we need not decide whether to adopt the *Blockburger* combination approach as a proper rule of statutory construction." *United States v. Pao Xiong*, 595 F.3d 697, 698-99 (7th Cir. 2010); *see also United States v. Martin*, 523 F.3d 281, 292 (4th Cir. 2008) (assuming without deciding that the *Corona* court's approach to *Blockburger* applied).

We express no opinion on whether *Corona* correctly decided the double-jeopardy issue. This case does not require us to do so. In light of our conclusions in *Shriver* and *Ihmoud* about the clarity of legislative intent with respect to § 844(h), the plain language of § 844(h), and the novelty of the *Corona* court's *Blockburger* approach, it cannot be said that any error by the district court was clear or obvious under current law. It suffices for us to say that "the statute and case law do not provide a clear answer, and the appellant's 'claim of error is at least subject to

reasonable dispute.'" *Hinkeldey*, 626 F.3d at 1013 (quoting *Pazour*, 609 F.3d at 953); *see United States v. Ristine*, 335 F.3d 692, 695 (8th Cir. 2003) (concluding that the district court did not commit plain error, despite contrary precedent from another circuit, where "the current law concerning this issue is unsettled").

### B.    Motion to Sever

Anderson asserts that the district court should have severed his trial from that of Pisciotta and Sorrentino. We will not reverse the denial of a motion to sever unless the movant demonstrates an abuse of discretion resulting in clear prejudice. *United States v. Casteel*, 663 F.3d 1013, 1018 (8th Cir. 2011).

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). This preference is "especially compelling when the defendants are charged as co-conspirators." *United States v. Basile*, 109 F.3d 1304, 1309 (8th Cir. 1997). That said, if "consolidation for trial appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials." Fed. R. Crim. P. 14(a). This prejudice must be "severe or compelling." *Casteel*, 663 F.3d at 1018 (quoting *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009)). To demonstrate this prejudice, "a defendant must show that his defense was irreconcilable with that of the codefendant or that the jury was unable to compartmentalize the evidence." *Id.* (quoting *Lewis*, 557 F.3d at 609).

Anderson first contends that a severance was necessary because his defense was irreconcilable with Pisciotta's defense. "A defense is irreconcilable when the jury, to believe the core of one defense, must necessarily disbelieve the core of another." *Lewis*, 557 F.3d at 610 (quoting *United States v. Johnson*, 944 F.2d 396, 402 (8th Cir. 1991)). However, even irreconcilable defenses "are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538. "Antagonistic defenses require severance 'only when there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that

-18-

both are guilty.'" *Lewis*, 557 F.3d at 610 (ellipsis omitted) (quoting *United States v. Ortiz*, 315 F.3d 873, 898 (8th Cir. 2002)). "It is not sufficient that one defendant be taking the position that he knew nothing of the crime while asserting that his codefendant was involved." *Id.* (quoting *United States v. Lynch*, 800 F.2d 765, 768 (8th Cir. 1986)).

Anderson characterizes his defense as denying that he conspired with the other individual in the September 27 video, whom Anderson never identified. This defense, Anderson argues, is irreconcilable with Pisciotta's defense that he was not the person in the surveillance videos. But these defenses are not irreconcilable. To believe the core of Anderson's defense, the jury did not necessarily have to disbelieve the core of Pisciotta's defense. *See id.* at 609-10. Rather, the jury could have credited either, both, or—as it turned out—neither of their defenses. In particular, the jury could have believed that Anderson did not conspire with the individual shown in the September 27 surveillance video while also believing that Pisciotta was not one of the suspects in the surveillance videos. *See id.* Moreover, even if it could be said that Anderson's defense conflicted with Pisciotta's defense in some way, "[i]t is not sufficient that one defendant be taking the position that he knew nothing of the crime while asserting that his codefendant was involved." *Id.* (quoting *Lynch*, 800 F.2d at 768). Consequently, irreconcilable defenses does not provide a basis for severance here.

Second, Anderson claims that severance was warranted because the jury was unable to compartmentalize alleged evidence of Pisciotta and Sorrentino's "purported association with organized crime." The Government contends that Anderson failed to raise this basis for severance before or during trial, meaning that our review is for plain error. *See United States v. Sanchez-Garcia*, 685 F.3d 745, 754 (8th Cir. 2012). We agree.[2] Although Anderson moved to sever several times, he never asserted that

_____

[2]Federal Rule of Criminal Procedure Rule 12(b)(3) requires that a motion to sever be raised before trial "if the basis for the motion is then reasonably available" and "the motion can be determined without a trial on the merits." This alleged basis for severance was not reasonably available to Anderson before trial.

the jury's inability to compartmentalize evidence of Pisciotta and Sorrentino's alleged association with organized crime necessitated a severance. *See United States v. Crumley*, 528 F.3d 1053, 1062-63 (8th Cir. 2008); *see also United States v. Thornberg*, 844 F.2d 573, 575 (8th Cir. 1988) ("In general, preserving an issue is a matter of making a timely objection to the trial court and clearly stating the grounds for the objection, so that the trial court has an opportunity to prevent or correct the error in the first instance."). Under the plain-error standard, Anderson therefore must "show not only that there was a Rule 14 violation affecting his substantial rights, but also that there is some extraordinary reason for us to reverse such error despite his failure to raise the issue in the trial court." *Sanchez-Garcia*, 685 F.3d at 754 (quoting *United States v. Brown*, 560 F.3d 754, 766 (8th Cir. 2009)).

Anderson has not met this standard. When assessing the jury's ability to compartmentalize evidence, "we consider the complexity of the case, whether any of the defendants was acquitted, and the adequacy of the jury instructions and admonitions to the jury." *United States v. Ghant*, 339 F.3d 660, 666 (8th Cir. 2003). Although the trial here lasted seven days, the defendants were charged with committing the same four crimes, all of which were connected to the fire at the Hereford House. *Cf. United States v. Frank*, 354 F.3d 910, 920-21 (8th Cir. 2004) (finding no plain error in denial of severance for a six-day trial involving fifty-one counts). Moreover, the district court clearly instructed the jury that it should consider the evidence against each defendant separately. *See Ghant*, 339 F.3d at 666. And it appears that the jury followed these instructions: the jury convicted Anderson of mail fraud but acquitted Pisciotta and Sorrentino of this offense. *See Frank*, 354 F.3d at 921. The jury also made differentiated findings with respect to each defendant's predicate offense under § 844(h), finding that Anderson's predicate offense included both mail fraud and conspiracy to commit arson and mail fraud and that Pisciotta and Sorrentino's predicate offense was conspiracy to commit arson. Under these circumstances, we discern no Rule 14 violation affecting Anderson's substantial rights. *See Sanchez-Garcia*, 685 F.3d at 754.

## C.    Evidentiary Issues

Anderson also appeals four of the district court's evidentiary rulings.  We review evidentiary rulings for clear abuse of discretion, "reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict."  *United States v. Henley*, 766 F.3d 893, 914 (8th Cir. 2014) (quoting *United States v. Summage*, 575 F.3d 864, 877 (8th Cir. 2009)), *cert. denied*, --- S. Ct. ---, 2015 WL 436184 (Mar. 2, 2015).

Anderson first argues that the district court abused its discretion by admitting his statement during the bankruptcy hearing.  Anderson contends that this statement was irrelevant and that, even if relevant, the district court should have excluded it under Federal Rule of Evidence 403.  Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Unfair prejudice under Rule 403 "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *United States v. Bell*, 761 F.3d 900, 912 (8th Cir.) (quoting *United States v. Condon*, 720 F.3d 748, 755 (8th Cir. 2013)), *cert. denied*, 135 S. Ct. 503 (2014).  When determining whether the probative value of evidence is substantially outweighed by any of the concerns listed in Rule 403, we accord great deference to the district court's ruling.  *See Bell*, 761 F.3d at 912.

During the bankruptcy proceeding, Anderson stated, "All I can tell you is I was very idiotic in doing what I did, and hindsight is 20/20, but you know, there's 450 employees, you've been with them, a lot of them for twenty years, and you do crazy things. That's unfortunately who I am." By providing a possible financial motive for committing the crimes with which he was charged, Anderson's statement was relevant. *See* Fed. R. Evid. 401; *United States v. Guerrero-Cortez*, 110 F.3d 647, 652

(8th Cir. 1997) ("The threshold of relevance . . . is quite minimal."). Anderson further claims that the jury mistook this statement, particularly the part about "do[ing] crazy things," to be an admission of guilt, rather than a statement related to the bankruptcy proceeding. Any probative value this statement may have had, Anderson contends, was substantially outweighed by the dangers of unfair prejudice and misleading the jury under Rule 403. The district court did not abuse its discretion by concluding otherwise. Anderson's objected-to statement was admitted through the testimony of an ATF forensic auditor, who testified about the financial pressures that Anderson faced leading up to the fire. The witness unambiguously informed the jury that Anderson's statement was made during a bankruptcy hearing. Against this backdrop, the danger that Anderson's statement would lead to unfair prejudice or mislead the jury was minimal. Moreover, by providing a possible financial motive for Anderson to commit the crimes with which he was charged, this statement had substantial probative value. *See, e.g.*, *United States v. Emery*, 186 F.3d 921, 927 (8th Cir. 1999).

Second, Anderson appeals the district court's decision to admit his mid-2007 statement, made in reference to the Hereford House, that he would "just assume [sic] the place burn down." This statement, Anderson contends, was irrelevant and unfairly prejudicial under Rule 403. Anderson's relevance argument has no merit. The Government offered evidence that Anderson's financial difficulties began as early as January 2007. Anderson's statement from mid-2007 was relevant because it demonstrated the depth of those difficulties. We also agree with the district court that the probative value of this statement was not substantially outweighed by the danger for unfair prejudice. Although Anderson's statement could have been, as Anderson contends, merely a "tongue-in-cheek remark," it is just as likely that the statement demonstrated the gravity of his financial frustrations. *See United States v. McAtee*, 481 F.3d 1099, 1103-04 (8th Cir. 2007) (affirming decision to admit defendant's statement that could be interpreted in two ways). We discern no basis to conclude that this statement had an "undue tendency to suggest decision on an improper basis." *Bell*, 761 F.3d at 912 (quoting *Condon*, 720 F.3d at 755). It was not an abuse of discretion to allow the jury to determine what weight to give this statement.

Third, Anderson argues that the district court should not have admitted Balano's telephone records. These records showed a telephone call between Balano and Sorrentino on September 26, 2008 as well as a call between Balano and Anderson the next day, several hours after Anderson's meeting at the Hereford House with the suspect. This evidence corroborated Balano's testimony that he knew Anderson and Sorrentino. Anderson claims that Balano's telephone records were irrelevant and that, even if relevant, their probative value was substantially outweighed by the danger for unfair prejudice under Rule 403. Balano's telephone records are relevant evidence of a conspiracy. They establish a connection, albeit an indirect one, between two of the defendants shortly before and after Anderson met with the suspect at the Hereford House on September 27. Anderson further contends that in the absence of evidence about the content of Balano's telephone calls, there was a substantial risk that the jury would engage in "inference stacking" to convict him of conspiracy. Anderson greatly overstates this risk. Balano's telephone records were simply a small part of the Government's conspiracy case against Anderson, Pisciotta, and Sorrentino. We find no abuse of discretion in allowing their admission.

In his fourth and final evidentiary argument, Anderson appeals the admission of Special Agent Roberts's identification testimony. As discussed above, the district court permitted Special Agent Roberts to identify both Pisciotta and Sorrentino in the Hereford House surveillance footage. Anderson concedes that because he did not object to this testimony at trial, our review is for plain error. *See United States v. Jean-Guerrier*, 666 F.3d 1087, 1091 (8th Cir. 2012). As explained above, to prove plain error, Anderson must show, among other things, that the district court committed a clear or obvious error—*i.e.*, one that is not subject to reasonable dispute. *See Puckett*, 556 U.S. at 135.

Under Federal Rule of Evidence 701, "[a] witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Farnsworth*, 729

F.2d 1158, 1160 (8th Cir. 1984). When assessing whether there is some basis to conclude that a witness is more likely than the jury to identify the defendant correctly, we have considered whether the witness was familiar with the defendant's appearance around the time that the surveillance photograph was taken, whether the defendant changed his appearance between the time of the surveillance photograph and trial, and whether the surveillance photograph made it difficult for the jury to make a positive identification of the defendant. *Id.* at 1160-61; *United States v. Lucas*, 898 F.2d 606, 610-11 (8th Cir. 1990); *United States v. Wright*, 904 F.2d 403, 405 (8th Cir. 1990).

Considering these factors, we cannot say that the district court committed a clear or obvious error. Special Agent Roberts, it is true, did not observe Pisciotta and Sorrentino until mid-2009, six or so months after the Hereford House fire. But Special Agent Roberts's observations of Pisciotta and Sorrentino were made much closer in time than the jury's observations at trial more than four years after the fire. Special Agent Roberts also was very familiar with Pisciotta's and Sorrentino's appearances from reviewing surveillance footage of them from the pole camera. Moreover, Special Agent Roberts testified that both Pisciotta and Sorrentino had changed their appearances during the four years between the fire and the trial. The fact that the surveillance footage in which Special Agent Roberts identified Pisciotta and Sorrentino captured events that occurred at night further bolsters the helpfulness of his identification testimony.

Anderson responds by directing us to our statements in *Farnsworth* that "we do not encourage the use of lay opinion identification by police or parole officers" and that such identification testimony "should be used only when no other adequate identification testimony is available to the prosecution." 729 F.2d at 1161. Because the Government offered the identification testimony of other witnesses in addition to Special Agent Roberts, Anderson contends that Special Agent Roberts's testimony should not have been permitted. Anderson overreads *Farnsworth*, which affirmed the admission of the identification testimony of two parole officers even though a used car salesman also identified the defendant in surveillance photographs. *Id.* at 1160-61.

Furthermore, the excerpt of *Farnsworth* on which Anderson relies responded to a concern that identification testimony by a law enforcement officer may create constraints on cross-examination when the defendant would not want to delve into the circumstances of his relationship with the officer. *Id.* at 1161. There is no suggestion that a similar concern is present here. Our statement in *Farnsworth* that lay opinion identification testimony by a law enforcement officer "should be used only when no other adequate identification testimony is available to the prosecution," *id.*, then, is insufficient to establish a clear or obvious error.

### D.    Sixth Amendment Challenge

We next consider the challenge to the district court's decision to limit the cross-examination of Jenifer Sorrentino. This decision will not be reversed unless there has been a clear abuse of discretion and a showing of prejudice to the defendant. *United States v. Oaks*, 606 F.3d 530, 540 (8th Cir. 2010).

The Confrontation Clause of the Sixth Amendment provides a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The primary purpose of this right is to guarantee the opportunity for effective cross-examination, particularly with respect to a witness's potential bias." *United States v. Walley*, 567 F.3d 354, 358 (8th Cir. 2009). Under the Confrontation Clause, however, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Consequently, limiting the cross-examination of a government witness does not violate the Sixth Amendment unless the defendant shows that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Id.* at 680; *Walley*, 567 F.3d at 358.

The district court prevented Mark Sorrentino from cross-examining Ms. Sorrentino about an incident in which she intentionally and repeatedly rammed her car into his. The court did so on the basis of Federal Rule of Evidence 608(b). Mark Sorrentino also sought to offer eyewitness testimony about this incident. The court refused to allow this testimony, explaining:

> I think clearly you've established bias. You brought out that [Ms. Sorrentino] doesn't like [Mark Sorrentino]. I guess the issue is how many of these things could we do, and frankly, with divorced people we could do this most of today and all day tomorrow, in my experience. . . . I think I would be more inclined [to allow the testimony] if there wasn't any evidence of bias here. But . . . it's already been established that she doesn't like your guy and is an adverse witness to him.

We discern no abuse of discretion in the district court's decision to prevent Mark Sorrentino from cross-examining Ms. Sorrentino about the car-ramming incident. We agree with the district court that Ms. Sorrentino's bias against Mark Sorrentino was clearly established. During Ms. Sorrentino's cross-examination, Mark Sorrentino admitted an agreement concerning the division of their property and questioned her about the petition for the dissolution of their marriage. It was established that, after the divorce, Ms. Sorrentino told an officer that she "had no money and . . . no place to go." Ms. Sorrentino also confirmed that she told an officer that Mark Sorrentino "had a ton of money at his mother's residence." Ms. Sorrentino further admitted that she blamed her ex-husband for the foreclosure on their home. Mark Sorrentino also called his mother as a witness, who summed up her son's divorce from Ms. Sorrentino as "[m]ean and vindictive." Additionally, through questioning, Mark Sorrentino and Pisciotta verified that Ms. Sorrentino received a $10,000 reward for the information she provided to law enforcement in connection with this case.

In light of this evidence, further cross-examination about the obvious friction between Mark and Jenifer Sorrentino would not have left the jury with a "significantly

different impression" of Ms. Sorrentino's bias. *See Van Arsdall*, 475 U.S. at 680. Mark Sorrentino went to great lengths to establish his ex-wife's bias, and he was successful in doing so. *See United States v. Dale*, 614 F.3d 942, 957 (8th Cir. 2010) ("The touchstone of our inquiry . . . is whether [the defendant] was given an adequate opportunity to impeach the credibility of [the witness]."). For this reason, we cannot say that the district court's decision to prevent further cross-examination about this topic was an abuse of discretion. *See United States v. Street*, 548 F.3d 618, 626 (8th Cir. 2008) ("At trial [the defendant] had adequate opportunity to impeach [the witness], and he did so."); *United States v. Purkey*, 428 F.3d 738, 754 (8th Cir. 2005) ("[T]he district court did not abuse its discretion in limiting cross-examination that would have further established that point."). Furthermore, we see no abuse of discretion in the district court's decision not to allow Mark Sorrentino to call a witness to testify about the car-ramming incident.

### E.     Motion for Judgment of Acquittal

Only Anderson argues that the evidence was legally insufficient to support his convictions. "We review *de novo* a district court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor." *United States v. Stong*, 773 F.3d 920, 924 (8th Cir. 2014) (quoting *United States v. Vore*, 743 F.3d 1175, 1180 (8th Cir. 2014)), *petition for cert. filed*, --- U.S.L.W. --- (U.S. Mar. 9, 2015) (No. 14-8836). We will disturb Anderson's convictions only if "no reasonable jury could have found [him] guilty beyond a reasonable doubt." *See id.* (alteration in original) (quoting *Vore*, 743 F.3d at 1180).

Anderson first contends that there was too little evidence for a reasonable jury to convict him of conspiracy to commit arson and mail fraud. To prove Anderson guilty of conspiracy under 18 U.S.C. § 371, the Government had to show that "(1) two parties entered into an agreement or reached an understanding to commit a crime, and (2) at least one of the parties overtly acted in furtherance of the agreement." *United*

*States v. Bertling*, 510 F.3d 804, 808 (8th Cir. 2007) (quoting *United States v. Wang*, 964 F.2d 811, 813 (8th Cir. 1992)).

The Government's evidence, as Anderson sees it, necessarily required the jury to pile inference upon inference in order to find that he voluntarily and intentionally entered into a conspiracy to commit arson and mail fraud. Although the Supreme Court has stated that "charges of conspiracy are not to be made out by piling inference upon inference," *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943), we have explained that "*Direct Sales* and cases like it do not take from the jury the power to make inferences when the Government has presented evidence to support those inferences," *United States v. Molina-Perez*, 595 F.3d 854, 860 (8th Cir. 2010). Viewing the evidence in the light most favorable to the verdict, there was more than enough evidence for a reasonable jury to find beyond a reasonable doubt that Anderson conspired to commit arson and mail fraud.

The evidence connecting Anderson to the planning and the commission of the arson was overwhelming. The jury learned about Anderson's early-morning meeting on September 27 with the individual whom several witnesses identified as Pisciotta. Anderson gave Pisciotta a key to the restaurant, watched Pisciotta enter and exit the restaurant, and spent roughly fifty minutes showing him around the restaurant, including the back entrance that would be used on the night of the arson. Tellingly, for his meeting with Pisciotta, Anderson did not use his own security code to deactivate the restaurant's security system; he instead used that of a fired employee. The fired employee's security code, as the jury learned, was used twice more before the arson: on October 12 for what appeared to be a practice run and on October 19 shortly before the fire was set by three individuals, two of whom were identified as Pisciotta and Sorrentino.

Anderson responds that the jury could not infer that the September 27 meeting had an illicit purpose related to arson or mail fraud. This is so, Anderson contends, because he explained to ATF agents and to Stanislav that the meeting had another

purpose. But the evidence must be viewed in the light most favorable to the verdict, with all reasonable inferences being resolved in its favor. *See Stong*, 773 F.3d at 924. It should go without saying that a reasonable jury is entitled to disbelieve Anderson's shifting explanations for the September 27 meeting. *See United States v. Hermes*, 847 F.2d 493, 495 (8th Cir. 1988) (per curiam). Indeed, from Anderson's inconsistent stories—ranging from knowing nothing to meeting with a potential purchaser to purchasing "hot" stoves—a jury reasonably could infer consciousness of guilt. *See United States v. McGauley*, 786 F.2d 888, 892 (8th Cir. 1986).

The jury also heard about the financial distress facing Anderson and the Hereford House in the months before the fire, which supplied a ready motive for Anderson to conspire to commit arson and mail fraud. Anderson, as the jury learned, had explored various options to improve the restaurant's financial prospects, all to no avail. And from January 2008 until the fire, Anderson infused approximately $380,000 into the business through a series of unusual financial transactions. Anderson's contemporaneous statements further underscored the depth of the financial pressures that he was confronting. As but one example, the jury saw an email that Anderson wrote approximately one month before the fire, in which he stated: "Things are going down fast. We were unable to pay our payroll taxes of $50,000. Things are not getting any better. Sales are in the tank. Got me down." The Government also established that Travelers insured the Hereford House for building, property, and business-interruption losses and that, shortly after the fire, Anderson signed documentation to secure an insurance advance of $300,000. From this evidence, we have no hesitation concluding that a reasonable jury could find beyond a reasonable doubt that Anderson conspired to commit arson and mail fraud.

Anderson next argues that the evidence was insufficient to convict him of aiding and abetting arson. *See* 18 U.S.C. § 844(i) (criminalizing, as relevant here, "maliciously damag[ing] or destroy[ing], or attempt[ing] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property"); *id.* § 2(a) ("Whoever commits an offense against the United States or aids,

abets, counsels, commands, induces or procures its commission, is punishable as a principal."). In particular, Anderson contends that there was insufficient evidence for a reasonable jury to find that he knew that arson was going to be committed. Anderson's attempt to paint himself as an unwitting participant in the arson is without merit. Viewed most favorably to the verdict, Anderson's actions on September 27, his shifting explanations for those actions, and his admitted financial distress would allow a reasonable jury to conclude that he knew that the arson was going to be committed.

Anderson also contends that the Government did not present sufficient evidence to convict him of mail fraud. The elements of mail fraud under 18 U.S.C. § 1341 are "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) that the mail was used in furtherance of some essential step in the scheme." *United States v. Bennett*, 765 F.3d 887, 893 (8th Cir. 2014) (quoting *United States v. Cole*, 721 F.3d 1016, 1021 (8th Cir. 2013)), *cert. denied*, --- S. Ct. ---, 2015 WL 143870 (Feb. 23, 2015). Anderson contends that the Government's evidence of his intent to defraud was lacking. At best, Anderson believes the evidence shows that he made a mistake of judgment, not that he possessed an intent to defraud Travelers. But "[d]irect evidence of intent to defraud is not required. A jury may infer intent from all the facts and circumstances of the case." *United States v. Widgery*, 636 F.2d 200, 202 (8th Cir. 1980). The Government's proof of Anderson's financial distress along with the evidence directly linking him to the arson and the insurance claims would permit a reasonable jury to infer that Anderson intended to defraud Travelers.

Anderson also contends that the evidence was insufficient to convict him of using fire to commit another felony under § 844(h). Anderson's sole argument on this count is that there was insufficient evidence for a reasonable jury to conclude that he committed a predicate felony, as required by § 844(h). The jury found that Anderson's predicate felony included mail fraud and conspiracy to commit arson and

mail fraud. As discussed above, there was sufficient evidence for a reasonable jury to convict Anderson of both of these offenses.

### F. Cumulative Error

Anderson argues that we should reverse his convictions based on the cumulative effect of the alleged errors that we discuss above. "We may reverse on the basis of cumulative error only where the case as a whole presents an image of unfairness resulting in the deprivation of the defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United States v. Baldenegro-Valdez*, 703 F.3d 1117, 1124-25 (8th Cir. 2013). Because we reject all of Anderson's claimed errors, his cumulative-error argument fails. *See United States v. Wilkens*, 742 F.3d 354, 364 (8th Cir.), *cert. denied*, 134 S. Ct. 2744 (2014).

### G. Motion for a New Trial

We last consider Sorrentino and Pisciotta's motion for a new trial on the basis of newly discovered evidence. We review a district court's denial of such a motion for clear abuse of discretion. *United States v. Huggans*, 650 F.3d 1210, 1225 (8th Cir. 2011).

Upon a defendant's motion, a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting a new-trial motion based upon newly discovered evidence is proper under the following circumstances:

> (1) the evidence must have been discovered after the trial; (2) the failure to discover must not be attributable to a lack of due diligence on the part of the movant; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be likely to produce an acquittal if a new trial is granted.

*United States v. Johnson*, 450 F.3d 366, 372 (8th Cir. 2006) (quoting *United States v. Dittrich*, 204 F.3d 819, 821 (8th Cir. 2000)). This standard is "rigorous because these motions are disfavored." *United States v. Hollow Horn*, 523 F.3d 882, 889 (8th Cir. 2008) (quoting *United States v. Baker*, 479 F.3d 574, 577 (8th Cir. 2007)).

Mark Sorrentino's motion for a new trial, in which Pisciotta joined, was based on Jenifer Sorrentino's cell phone records. According to the motion, these records show that Ms. Sorrentino's cell phone received a call from the landline at the Sorrentinos' residence at 2:12 a.m. on October 20, 2008—roughly one hour and a half after the fire at the Hereford House began. In an affidavit attached to the motion, Mark Sorrentino averred that he made this call to Ms. Sorrentino's cell phone in order to determine her whereabouts and to ask her to come home. This evidence was not offered during trial, the motion explained, because Ms. Sorrentino's identity as a Government witness had been concealed as a result of a protective order and because the process for receiving Ms. Sorrentino's cell phone records took approximately two weeks.

Assuming without deciding that Ms. Sorrentino's cell phone records and Mark Sorrentino's affidavit constitute newly discovered evidence, we discern no abuse of discretion in the district court's denial of Mark Sorrentino and Pisciotta's motion for a new trial because this evidence would not be likely to produce an acquittal if a new trial were granted. *See Johnson*, 450 F.3d at 372. It is true that Ms. Sorrentino's testimony against Mark Sorrentino and, to a lesser degree, against Pisciotta was incriminating. However, as discussed above, Ms. Sorrentino's bias against Mark Sorrentino was apparent. The jury also learned that Ms. Sorrentino's player card was used at a casino throughout the night of the fire, at a time when Ms. Sorrentino told the jury that she was at home. Although Ms. Sorrentino offered an explanation for this fact, the player-card evidence clearly impeached her testimony about her whereabouts on the night of the fire. The evidence that Mark Sorrentino and Pisciotta

now offer, if admitted during a new trial, simply would have provided further impeachment evidence on this same issue. *Cf. Hollow Horn*, 523 F.3d at 890 ("[A] defendant's motion for new trial 'is properly denied if the newly discovered evidence is merely impeaching." (ellipsis omitted) (quoting *United States v. Grover*, 511 F.3d 779, 783 (8th Cir. 2007)); *Johnson*, 450 F.3d at 372-73.

Furthermore, contrary to Sorrentino's and Pisciotta's contentions, the Government's case against them did not rise and fall on Ms. Sorrentino's testimony. There was circumstantial evidence linking them to Anderson and the fire, including Balano's telephone records and their behavior the day after Special Agent Roberts interviewed Balano, when Pisciotta appeared to check Sorrentino for a listening device. The jury also learned that Sorrentino called Pisciotta roughly fifteen minutes before the September 27 meeting. The jury also was able to compare the light-colored car depicted in the October 12 surveillance video to pictures of Pisciotta's light tan Lincoln Continental.

Additionally, the Government's identification case against Pisciotta and Sorrentino was strong. Sorrentino and Pisciotta make much of the fact that several witnesses claimed they could not identify Sorrentino or Pisciotta in the Hereford House surveillance videos. However, apart from Ms. Sorrentino, two other witnesses identified Pisciotta in the September 27 surveillance video, and Special Agent Roberts identified both Pisciotta and Sorrentino in the surveillance footage. The jury also became familiar with Pisciotta's and Sorrentino's appearances by reviewing numerous photographs of them that were admitted into evidence and by observing them at trial, thereby allowing the jury to compare Pisciotta and Sorrentino to the individuals in the surveillance videos. For these reasons, Ms. Sorrentino's cell phone records and Mark Sorrentino's affidavit "at most create[] a conflict in the evidence, not a likelihood of acquittal." *United States v. Estabrook*, 774 F.2d 284, 290 (8th Cir. 1985). The denial of Sorrentino and Pisciotta's motion for a new trial was not an abuse of discretion.

### III. Conclusion

For the reasons described above, we affirm the judgment of the district court.

_____